## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| Shane Simmons, Chris Cook, Larry Basil, Jerry Candelaria, Brian Clark, Tim Coggins, Yvonne Marrone, Thomas Martinez, Steve McKay, Jack Smith, John Smith and Paul Smith on behalf of themselves and all others similarly situated,<br><br>           Plaintiffs,<br><br>      v.<br><br>Valspar Corporation,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 10-3026 RHK/SER<br><br>**The Honorable Richard H. Kyle**<br><br>**DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION AND COURT-FACILITATED NOTICE** |

## I.     INTRODUCTION

Conditional certification of the proposed nationwide class of Valspar Territory Managers (TMs) should be denied because the factual record before the Court, *including Plaintiffs' own evidence*, makes it clear that Plaintiffs are not similarly situated.  The undisputed facts demonstrate that there is significant variation in the mix of job duties performed by TMs and the manner in which they perform them.  Although Plaintiffs assert in carbon-copy declarations that all TMs perform the same eighteen job duties,[1] their list of job duties does not support conditional certification, as Plaintiffs nowhere

---

[1] It is evident that the list of job duties in the declarations was not generated based on Plaintiffs' own jobs.  As is described more fully herein, *see* Section IV(A)(8), *infra*, the list of duties is copied almost verbatim from declarations that were filed by different employees of a different employer in another case.

describe how the listed duties are performed or how much time they spend on each. Plaintiffs' deposition testimony, by contrast, shows that Plaintiffs do not all perform the same job duties, spend substantially different amounts of time performing those duties they share, and exercise widely varying amounts of discretion in performing them. Additional declarations submitted by other putative class members show further significant job duty variations. Indeed, apart from their job title, it is readily apparent that the only characteristic all TMs truly share in common is that Valspar provides them the autonomy and discretion to perform their jobs on a day to day basis as they see fit, with virtually no supervision from Valspar management.

The central issue in this case is whether TMs are properly classified as exempt from the overtime requirements of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA"), under three separate exemptions: the administrative, outside sales, and combination exemptions. This Court has repeatedly stressed that application of these exemptions requires a "fact-driven and Plaintiff specific" analysis, *see Cruz v. Lawson Software, Inc.*, No. 08-5900 (MJD/JSM), 2011 WL 291424, *9 (D. Minn. Jan. 27, 2011), yet Plaintiffs have not made *any attempt at all* to describe to the Court how this fact-driven, Plaintiff-specific analysis could be managed on a class-wide basis given the substantial variation in TM job duties across the more than 1,700 Lowe's stores they work at, in 21 Valspar regions, covering all 50 states. Plaintiffs bear the burden of demonstrating that the putative class is similarly situated with respect to the applicable exemptions, and their failure to do so requires that conditional certification be denied.

## II.     FACTUAL BACKGROUND

### A.      Defendant Valspar Corporation

Defendant Valspar Corporation ("Valspar") has been in business since 1806. Valspar manufactures paints, stains and other coatings which are sold throughout the United States, including at Lowe's Home Center stores.

Valspar is one of several lines of paints sold at Lowe's stores.[2]  Competitor paints also sold at Lowe's include Olympic Paint, Rust-Oleum, and Zinsser.  Lowe's regularly reviews its "return on investment" on each line of paint and, based on that review, determines whether to continue stocking a paint line, how much store space to allocate to that company's paint, and how much visibility the paint line should be given in marketing spaces such as the Lowe's website.[3]  All of these decisions can have a tremendous impact on Valspar sales.[4]

### B.      The Role of Valspar Territory Managers

Valspar employs TMs to market Valspar products, drive Valspar sales, and interact with Valspar customers.  Every TM is assigned a unique geographic territory that contains between 3 and 10 Lowe's stores.[5]  TMs serve as the "face of Valspar" within their assigned territory.[6]  They represent Valspar to Lowe's stores and Lowe's district

---

[2] Weyrens Dec ¶7.  Note:  All declarations and relevant portions of deposition transcripts are attached to the Declaration of Joan B. Tucker Fife, filed concurrently herewith. Declarations are referenced as "Dec." and depositions are referenced as "Dep."

[3] Weyrens Dec ¶8.

[4] Cooper Dec. ¶10, Auten Dec. ¶16, Vaughn Dec. ¶19.

[5] Scribner Dec. ¶2, Black Dec. ¶2, Hurley Dec. ¶5, Cooper Dec. ¶3.

[6] Scribner Dec. ¶3, Lamone Dec ¶3, Hurley Dec. ¶6, Auten Dec. ¶12, Cooper Dec. ¶9, Vaughn Dec ¶20, Compton Dec. ¶5, Dickson Dec. ¶¶4, 22.

managers,[7] train Lowe's associates,[8] track and analyze the sales numbers at their assigned stores,[9] develop and implement marketing strategies that are responsive to those numbers,[10] manage the inventory in each store to maximize the "return on investment" to Valspar and to Lowe's,[11] market and sell Valspar products to customers in Lowe's stores,[12] market and promote Valspar products to contractors in the field outside Lowe's stores,[13] and resolve customer complaints in a way that is both economical and preserves good customer relationships.[14] TMs are expected to treat the sale of Valspar products in their assigned territory as if it was their own business, and to exercise sound business judgment, salesmanship, knowledge of local circumstances, and strategic marketing to maximize Valspar's sales potential.[15] As is further described in Section II(F), the breadth

---

[7] Cooper Dec. ¶9, Scribner Dec. ¶¶3, 11-14, Wade Dec. ¶¶4, 12-14, Hurley Dec. ¶¶4, 6, Auten Dec. ¶7, Vaughn Dec. ¶20, Compton Dec. ¶¶5, 12-15, Dickson Dec. ¶12.

[8] Cooper Dec. ¶32, Wade Dec. ¶¶23-25, Black Dec. ¶¶21-22, Compton Dec. ¶¶22-23, Basil Dep. 271:11-272:16, McKay Dep. 77:3-11, 114:1-4, 132:19-133:8, Grimes Dep. 149:4-150:3, Cook Dep. 215:17-22, Jack Smith Dep. 70:17-24.

[9] Scribner Dec. ¶10, Wade Dec. ¶11, Black Dec. ¶12, Lamone Dec. ¶13, Hamilton Dec. ¶10, Hurley Dec. ¶25, Basil Dep. 270:20-24, Simmons Dep. 245:13-246:8, Coggins Dep. 171:15-21, Dickson Dec. ¶15-16.

[10] Scribner Dec. ¶¶10, 12-14, Wade Dec. ¶¶11, 13-15, Black Dec. ¶12, Lamone Dec. ¶15, Compton Dec. ¶¶11, 13, 16-17, Dickson Dec. ¶15-16, Weaver Dec. ¶¶11, 15,19.

[11] Scribner Dec. ¶18, Wade Dec. ¶20, Hamilton Dec. ¶¶19-20, Hurley Dec. ¶30-31, Cooper Dec. ¶10, Auten Dec. ¶26, Vaughn Dec. ¶17, Compton Dec. ¶19.

[12] Scribner Dec. ¶¶15-16, 19-20, Black Dec. ¶2, Lamone Dec ¶2, Hamilton Dec. ¶3, Hurley Dec. ¶¶10-11, Cooper Dec. ¶30, Basil Dep. 147:16-148:12, McKay Dep. 294:21-295:4, Simmons Dep. 105:14-107:3.

[13] Hamilton Dec. ¶28, Cooper Dec. ¶34, Compton Dec. ¶28, Auten Dec. ¶¶6, 8-9, Vaughn Dec. ¶34, Dickson Dec. ¶23, Jack Smith Dep. 148:11-17.

[14] Dickson Dec. ¶22, Scribner Dec. ¶¶24-25, Wade Dec. ¶¶26-27, Black Dec ¶¶23-24, Compton Dec. ¶28, Lamone Dec ¶25, Hamilton Dec. ¶27.

[15] Auten Dec. ¶4 ("My last Regional Manager often said, 'Your territory. Your plan. Our success.'"), Black Dec. ¶¶4, 7, 11, 18, Hurley Dec. ¶38, Jack Smith Dep. 245:15-24 (told

and discretionary nature of these duties, together with the considerable autonomy TMs enjoy in performing them, produce a tremendous amount of variation in the mix of job duties TMs perform from day to day, as well as in the manner they perform them.

## C.     Territory Managers Are Paid And Reviewed Based On Their Sales Results, Their Marketing Skills, And Their Business Acumen.

The TM job is all about sales and marketing, and their compensation structure and performance review criteria reflect that.  Each TM is expected to develop a quarterly strategic plan that sets sales and marketing goals and establishes a strategy for achieving them.[16]  A significant portion of a TM's compensation – up to $14,287, and as much as 30.6% of total compensation – comes from a bonus plan that is tied directly to sales results in the Lowe's stores in a TM's assigned territory.[17]  TM performance reviews focus on sales performance, business judgment, marketing skills, building positive relationships with Lowe's management, and effective resolution of customer complaints.[18]  Numerous TMs state in their declarations that this structure motivates them to think entrepreneurially and to develop marketing strategies to maximize sales in each of their stores.[19]

---

that working for "Valspar is a business that you own . . . quite often, that it is our territory").

[16] Wade Dec. ¶10, Black Dec ¶10, Hamilton Dec. ¶4, Cooper Dec. ¶33, Basil Dep. 274:1-20, Dickson Dec. ¶7.

[17] Weyrens Dec. ¶3.  The bonus plan has changed over time, but currently has three components:  (1) the average price per gallon of Valspar product sold in the territory; (2) total sales in the territory of Valspar's commercial professional products; and (3) sales growth in the Lowe's stores in the territory over the last year.  Compton Dec. ¶6.

[18] *See, e.g.*, Coggins Dep. 202:9-204:22, 219:10-220:7, Exs. 8, 9.

[19] Scribner Dec. ¶¶4-5, Wade Dec. ¶¶5-6, Auten Dec. ¶31, Compton Dec. ¶6, Weaver Dec. ¶5, Nieto-Gorski Dec. ¶6.

**D.    Every TM Works In A Geographically Unique Territory.**

Every TM's territory is unique.  There is no overlap between the territories; every Lowe's store is covered by one and only one TM.[20]  Because TMs are required to understand local circumstances to effectively market and sell Valspar products, and because a TM's job critically depends on building and maintaining good relationships with local Lowe's store and district managers, TMs are not fungible.  A TM cannot simply be moved from one territory to another and immediately pick up the job, but rather must first spend time learning local circumstances, analyzing local sales dynamics, and building personal relationships to be effective.[21]

**E.    Territory Managers Have Considerable Autonomy As To How They Spend Their Days, And Function With Minimal Supervision.**

All eight plaintiffs who have been deposed, as well as all 13 TMs that have submitted personalized declarations, acknowledge that they perform their jobs with considerable autonomy.[22]  TMs decide which Lowe's store in their territory to visit each day, or whether more than one store requires a visit.[23]  They determine how often to be outside Lowe's stores marketing Valspar products to contractors, and use their own

---

[20] Weyrens Dec. ¶2.

[21] Weyrens Dec. ¶5.

[22] *See* Coggins Dep. 103:21-104:24, 107:13-108:3, 121:22-122:8; Simmons Dep. 258:13-15, 259:17-260:16; Jack Smith Dep. 110:20-25, 126:20-127:2 , 245:15-24, 257:11-16; Cox Dep. 169:13-170:4, 181:8-185:19; Basil Dep. 75:15-76:8, 194:7-17, 257:5-16, 273:3-5, Cook Dep. 61:3-23, 203:24-204:7, 205:18-24, Grimes Dec. 100:14-102:15, 103:19-104:6, 133:3-12, 134:2-138:4, 149:16-150:3, 161:5-16, 186:16-187:8, McKay Dep. 251:17-252:14, 157:18-158:2.  TMs report to Regional Managers (RMs).  There are 21 Valspar regions, and between 11 and 18 TMs report to each RM.  Weyrens Dec ¶4.

[23] Grimes Dep. 134:2-5, Lamone Dec ¶¶8-9, Hamilton Dec. ¶8, Auten Dec. ¶6, Vaughn Dec. ¶35, Dickson Dec. ¶¶5, 8, Basil Dep. 77:24-80:12, 273:3-5, Jack Smith Dep. 102:12-20, Simmons Dep. 44:20-45:8.

initiative in identifying which contractors to approach.[24]  If they are at a Lowe's store, they decide what duties to perform while they are there.[25]  They determine how to approach establishing and building relationships with Lowe's store and district managers – no scripts are provided by Valspar – as well as how often to set up sales meetings with them.[26]  TMs decide for themselves when and how to train Lowe's associates on selling Valspar products.[27]  TMs independently analyze store-by-store sales numbers in their assigned territory, and use their own experience and business judgment to make inventory and marketing recommendations based on that analysis.[28]  They also decide when and whether to approach Lowe's store and district managers to recommend and implement sales and marketing strategies such as constructing stack-outs for Valspar products, cross-marketing Valspar products outside the paint department, holding

---

[24] Wade Dec. ¶¶7, 9, 28, Hurley Dec. ¶23, Compton Dec. ¶¶7, 28, Vaughn Dec. ¶29, McKay Dep. 186:23-188:14.

[25] Scribner Dec. ¶¶7-8, Black Dec ¶4, Lamone Dec ¶10, Hamilton Dec. ¶9, Auten Dec. ¶6, Dickson Dec. ¶¶8, 9 , Basil Dep. 257:5-16, Coggins Dep. 91:19-92:20.

[26] Scribner Dec. ¶¶11-14, Wade Dec. ¶¶12-15, Compton Dec. ¶¶12-15, Hamilton Dec. ¶¶ 12, 15, Hurley Dec. ¶7, 9, Dickson Dec. ¶13-14. Valspar establishes a low minimum number of meetings that must be held, but most TMs exercise their discretion to significantly exceed the established minimums.  Coggins Dep. 170:19-171:14 (at least 2 formal meetings are required per year), Weaver Dec. ¶13 (4 formal meetings per year), Cooper Dec. ¶27 (4 or 5 formal meetings per year), Wade ¶13 (4 formal meetings per year).

[27] Vaughn Dec. ¶9 ("I have complete discretion in determining which stores to focus my training efforts, which products to train on, and which associates to train.  I also have complete discretion in the method of training that I use"), Scribner Dec. ¶¶22-23, Compton Dec. ¶¶22-23, Black Dec. ¶¶21-22, Cooper Dec. ¶32, Auten Dec. ¶21.

[28] Wade Dec. ¶¶11, 13-21, Compton Dec. ¶¶11, 13, 15-20, Hamilton Dec. ¶¶10-13, 17, 19-21, Hurley Dec. ¶¶25-31, Black Dec. ¶19, Lamone Dec. ¶19, Weaver Dec. ¶¶11, 15, 19.

marketing breakfasts for contractors, and creating brush-out displays.[29]  TMs decide for

themselves when and how to interact with customers in Lowe's stores,[30] have the

authority to resolve most customer complaints entirely on their own,[31] and decide on their

own whether a particular complaint warrants a customer site visit.[32]

**F.     Territory Managers Perform A Wide Variety Of Tasks And Make Numerous
         Discretionary Decisions Every Day, So No Two Days Look Alike.**

Because TMs have substantial autonomy to decide what tasks to perform each

day, their actual job duties vary substantially day-to-day and week-to-week.   The

discretion TMs are provided as to how to approach their sales and marketing

responsibilities creates further significant variation between TMs as to how their jobs are

performed.

**1.     Plaintiffs' Declarations Demonstrate They Performed A Wide Variety Of
         Duties    Requiring    Individual    Judgments    And    Store-Specific
         Implementation.**

All of the named Plaintiffs acknowledge that their job responsibilities fall into

three broad categories:  (1) inventory management, (2) event and brand marketing, and

(3) product training.[33]  All of the Plaintiffs list in their declarations at least eighteen

---

[29] Wade Dec. ¶¶15-16, 18-19, Compton Dec. ¶¶16-18, Black Dec. ¶¶12, 17, 18, Hamilton Dec. ¶¶13, 15-18, Hurley Dec. ¶¶27-29, 33, Dickson Dec. ¶14-15, 17-18.
[30] Scribner Dec. ¶20, Wade Dec. ¶22, Compton Dec. ¶21, Hurley Dec. ¶¶10-11.
[31] Auten Dec. ¶¶27-30, Scribner Dec. ¶¶24-25, Wade Dec. ¶¶26-27, Compton Dec. ¶¶25-26, Hamilton Dec. ¶¶ 26-27, Basil Dep. 194:7-17, Grimes Dep. 94:15-95:16.
[32] Scribner Dec. ¶24, Wade Dec. ¶26, Cooper Dec. ¶36, Vaughn Dec. ¶32, Jack Smith Dep. 122:24-123:11, Simmons Dep. 73:16-18, Coggins Dep. 74:1-12, 167:4-24.
[33] *See* Plaintiffs' Exs. C-M, Declarations of Plaintiffs Shane Simmons ¶5, Chris Cook ¶5, Larry Basil ¶5, Jerry Candelaria ¶5, Tim Coggins ¶5, Yvonne Marrone ¶5, Thomas Martinez ¶5, Steve McKay ¶5, Jack Smith ¶5, John Smith ¶5, and Paul Smith ¶5. Because Plaintiffs' declarations are virtually identical and all contain essentially the same

discrete tasks they performed as part of these job duties.[34]  None of the Plaintiffs provides in their declarations any estimate as to how much time they spent performing each of these tasks, or any description of how or how often they performed them.  *Id*.  Moreover, none of the Plaintiffs claims that the list of eighteen duties is exhaustive:  each declaration merely states that a TM's role and responsibilities "included" the tasks that are listed.[35]

Even among the duties the Plaintiffs do expressly list, it is clear many of the tasks require the exercise of independent judgment and will necessarily be implemented differently at different Lowe's stores and by different TMs.  For example, the Plaintiffs all acknowledge that they engaged in "event and brand marketing,"[36] "[visiting] contractors outside the stores,"[37] meeting with Lowe's Store Managers and District Managers to "review Valspar programs" and "build rapport,"[38] "cross-merchandising Valspar products,"[39] "holding in-store clinics about Valspar products,"[40] training Lowe's associates who sell to customers and to contractors,[41] "[w]orking Lowe's tent sales and

---

substantive statements in identically numbered paragraphs, future citations will be collectively to "Plaintiffs' Dec."
[34] Plaintiffs' Dec. ¶¶10-12.
[35] *Id.* ¶¶5, 10-12.
[36] *Id.* ¶5.
[37] *Id.* ¶11.
[38] *Id.* ¶10(k)-(l).
[39] *Id.* ¶10(i).
[40] *Id.* ¶10(p).
[41] *Id.* ¶10(h), (j), (m).

trailer events,"[42] providing demonstrations of Valspar's products to Lowe's customers,[43] and "address[ing] customer complaints."[44]

### 2. Further Details Provided By Depositions of Plaintiffs And Personalized Declarations Of Territory Managers Illustrate The Wide Variation In Job Duties And Mix Of Job Duties.

The undisputed facts show that TMs exercise their autonomy to perform their various job responsibilities very differently, and that different TMs spent widely varying amounts of time on their various job responsibilities.  Indeed, even if only the deposition testimony of the named Plaintiffs is taken into account, the variation in their job duties is so significant – including several duties some Plaintiffs perform, while others do not – that it is clear the Plaintiffs are not even similarly situated to each other.   The following charts highlight some examples of areas where TM job responsibilities differ from TM to TM.

---

[42] *Id.* ¶10(o).
[43] *Id.* ¶10(h).
[44] *Id*. ¶11.

| Developing and implementing strategic marketing plans | | |
|---|---|---|
| Pls. Do Not Do It | Pls. Do It, With Variations | Other TMs Do It Differently |
| No one at Valspar ever asked me to put together a strategic marketing plan. Simmons Dep. 247:5-8.<br><br>I did not have "any responsibilities for marketing Valspar paint[.]" Grimes Dep. 193:22-25. | I agree that I am expected to create a strategic marketing plan each quarter where I come up with things that I commit to doing to increase sales of Valspar products. Basil Dep. 274:1-20.<br><br>Each Regional Manager "is a little bit different" on what they expect in your strategic marketing plan. Jack Smith Dep. 85:19-21.<br><br>After giving the strategic marketing plan to my boss, "he told me what to change and what not to change." Cook Dep. 139:18-22. | "I create a strategic marketing plan that helps me figure out how to increase my bonus and drive sales. The strategic marketing plan is completely based off the three components in our bonus structure. I will often brainstorm with other Territory Managers when coming up with this plan." Hamilton Dec. ¶4.<br><br>"I have the experience, discretion, analysis skills, and knowledge to design a successful plan on my own." Cooper Dec. ¶33. |

| Developing store-specific marketing strategies and persuading Lowe's store and district managers to implement them | | |
|---|---|---|
| Pls. Do Not Do It | Pls. Do It, With Variations | Other TMs Do It Differently |
| "I can't tell them [Lowe's] where to put product. I can't tell them that hey, this product needs to be up to the front, this product needs to be here." Cook Dep. 179:17-20.<br><br>I never made recommendations to the district manager | It "obviously" helps to have good relationships with the store managers because "if they know who you are . . . they're more likely to give you a little extra space." Jack Smith Dep. 82:2-7.<br><br>"I'm . . . meeting with Lowe's store managers and assistant managers . . . to build rapport . . . ." Coggins Dep. 239:7-9. | "I . . . strategize how I am going to increase sales of underperforming products with new marketing plans . . . . It is a lot easier to implement my sales strategy when I have the support of both the district manager and individual store manager." Wade Dec. ¶¶11, 13.<br><br>I suggested a stack out to a store manager and "[t]he |

| | | |
|---|---|---|
| about something he or she could do in their district to increase sales. Cox Dep. 163:10-15.<br><br>Simmons says that his job responsibilities did not include participating in decisions about merchandising. Simmons Dep. 254:2-6. | | stack out of the primer near drywall was so successful that [he] pitched the idea to the district manager – asking him if I could do it in all of the stores in my territory. The manager said yes, and it was successful." Hurley Dec. ¶¶27-28.<br><br>"The more comfortable a store manager is with me, the more likely he is to listen to my suggestions for improving marketing and sales of Valspar products at the Lowe's stores." Compton Dec. ¶14.<br><br>"I am always trying to identify avenues for enhancing Valspar's image and visibility at Lowe's and—in turn—drive sales.  A good example of this is contractor breakfasts . . . The store . . . invites contractors in  the community [and] I offered that Valspar would pay for the breakfast . . . I came up with the idea for contractor breakfast on my own based on my analysis of sales numbers. Hurley Dec. ¶33 |

| Managing inventory using business analytics to maximize Valspar's and Lowe's Return on Investment | | |
|---|---|---|
| Pls. Never Do It | Pls. Monitor and Make Recommendations | Other TMs Do It Differently |
| "[S]uggesting inventory replenishment is not what I do." Coggins Dep. 262:8-10.<br><br>"[I]t's a Lowe's decision is my understanding because they pay for that . . . [i]t's nothing that I could have done." Cox Dep. 168:24-169:12.<br><br>"That comes from Lowe's . . . [t]hey do all the inventory." Cook Dep. 123:1-5. | "We can make suggestions to them. Like I said, one of the biggest things with the sales -- with the sales trends was the seasons. You know, obviously in, you know, winter you don't want a ton of exterior paint, whereas in the summer you do, you know. So that's where, you know, you can make suggestions to them as far as increasing the counter stocks during this particular time." Simmons Dep. 267:11-19.<br><br>I agree that if I never look at inventory levels and if a shelf goes bare that it could negatively affect my sales, so by being diligent in watching the inventory levels and watching what paint is on the shelf I can impact sales. McKay Dep. 296:25-297:14. | "Lowe's has an inventory management system, but I find it does not work well for paint.  I constantly need to monitor the inventory levels." Auten Dec. ¶26.<br><br>"In order to generate sales, I have to make sure Lowe's stores have the appropriate amount of product in stock.  I have influence in setting 'counter stock' and inventory levels and will often monitor these numbers and make sure they are in line with my sales projections." Hamilton Dec. ¶19.<br><br>"I also look to trends when making recommendations to my supervisor that Lowe's should increase the base order amount for a particular item because its sales are showing increases." Black Dec. ¶12.<br><br>"[I]f I recommend an order, [my managers] will almost always place it." Lamone Dec. ¶19. |

| Approaching customers in Lowe's, analyzing their needs, and selling Valspar products | | |
|---|---|---|
| Pls. Do Not Do It | Pls. Do It, With Variations | Other TMs Do It Differently |
| "I generally don't approach customers in stores . . . [b]ecause I'm usually busy doing something else." Jack Smith Dep. 259:24-260:4. | I would help customers "[j]ust kind of intermittent through the day. One could say eight hours a day, nine hours a day, and then you could say 10 minutes a day. It varied." Cox Dep. 151:23-152:7.<br><br>Part of the selling process is assessing the customer's need, asking the customer questions about what they need the product for, or asking the customer what they are planning to do with the product. McKay Dep. 82:11-23.<br><br>When I interact with customers in the store, I am "interacting with [them] to try to promote the sale of Valspar paint . . . ."  Basil Dep. 147:22-148:1. | "I like spending a lot of time with customers—it means that I have more time to sell and explain a product, which in turn leads to better results." Compton Dec. ¶4.<br><br>"I am proactive when it comes to customer interactions and usually approach customers, introduce myself as a Valspar representative and try to help the customer find a Valspar product that fits his or her needs . . . . I usually begin by asking a broad, general question, such as "what project are you working on today?" and then more specific questions so that I can assess the customer's needs, and determine on my own how to persuade the customer that Valspar's products are best suited to meeting their needs." Wade Dec. ¶22.<br><br>I "analyz[e] the customer's needs and giv[e] advice on how to select the optimal product or product combination from among a range of possibilities that could be recommended." Vaughn Dec. ¶28. |

| Training Lowe's associates to sell Valspar products, and persuading them to sell Valspar products over those of competitors | | |
|---|---|---|
| Pls. Train Perfunctorily | Pls. Tailor Their Training | Other TMs Do It Differently |
| When conducting aisle training, I would tell Lowe's associates "hey, let's look at the back of the can." Cox Dep., 133:3-18.<br><br>"[I]t's all predetermined what I can do as far as how I train, how I . . . talk to associates . . . I have no way of telling the . . . associate to sell paint." Coggins Dep. 140:6-11. | Once I met "whatever training they wanted" then "I could do training on anything anytime I wanted to after that." Basil Dep. 272:12-14.<br><br>"There are times that [I] . . . get to make the decision [what] I'm going to train on . . . [a]nd . . . sometimes [I] make the decision to train on a particular product because [I] think I need to increase sales on that particular product." McKay Dep. 157:18-158:2. | "I have complete discretion in deciding how to conduct training and what elements to include, depending on my analysis of the needs of a particular store and what will best serve to boost sales there." Hurley Dec. ¶21.<br><br>"I decide when and how to conduct training. I usually train Lowe's associates with brush outs and demonstrations. I like to do "hands on" trainings where the associates actually brush the product out themselves because I believe they will understand the product and its capabilities better if they actually use it, rather than just listen to me talk about it." Wade Dec. ¶24. |

| Identifying contractors outside Lowe's stores and marketing contractor-grade premium paint products to them | | |
|---|---|---|
| Pls. Do Not Exercise Salesmanship | Pls. Do Exercise Salesmanship | Other TMs Exercise Salesmanship |
| I "[g]o to the job sites and give [contractors] brochures on our products . . . [w]e're not allowed to price it or anything." Cook Dep. 37:24-38:4.<br><br>I did not interact with contractors in any way that influenced sales, and if anyone else did, they were doing their job differently.  Basil Dep. 147:5-15. | "I make them [contractors] try to understand that this could work for them, you know, this is going to do the job." Coggins Dep. 84:5-19. | "I am also responsible for building and maintaining relationships with contractors on commercial accounts." Black Dec. ¶8.<br><br>"[W]hen the professional line was introduced, I visited Green Painting, a medium sized painting contractor. Over the last two years, I have worked with the Lowe's commercial sales associates to persuade Green Painting's owner to purchase more and more Valspar products." Hamilton Dec. ¶28.<br><br>"I can sometimes offer over 20% discounts to contractors." Cooper Dec. ¶35. |

| Using Valspar's "Business Intelligence" system to analyze sales trends in Lowe's stores | | |
|---|---|---|
| Pls. Just Looked At The #s | Pls. Used The #s To Analyze | Other TMs Do It Differently |
| "We do what they tell us.  They tell us we have to show these reports, we have a district manager meeting once every quarter and we show them the report." | I look at the BI numbers "to see what . . . is going on . . . – if anything is happening or if we are . . . selling some product or kind of what's going out the door . . . ." Coggins Dep. 258:9-17. | "I analyze [the BI] reports as much as I can to determine where to focus my efforts . . . They also allow me to analyze the successes of each store and bring similar promotions and marketing strategies to under |

| | | |
|---|---|---|
| Cook Dep. 99:2-20.<br><br>"[T]here was a report that was prepared by Valspar called the district manager's report, and it was basically designed by our corporate office . . . and so we would print that out, usually the night before, be as fresh as possible, and when they have the DM meeting I'd show the DM hey, here's the DM report that I pulled off the BI system that was prepared for you by either the computer or someone from our office, and they would look at it and be like oh, well, check that out." Cox Dep. 161: 14-25. | | performing locations.  I also use this system to determine what the trends are and capitalize on them." Scribner Dec. ¶10.<br><br>"I regularly analyze sales numbers to determine where to focus my efforts in each Lowe's store.  For example, I use my assessments to determine which Lowe's managers to target to convince to allow me to set-up an end-cap, display or stack out and to support my recommendation that I implement more training for Lowe's associates." Black Dec. ¶12. |

| Resolving customer complaints | | |
|---|---|---|
| Pls. Have Varying Authority Levels | Pls. Have Varying Ability To Recommend How To Resolve Big Complaints | Other TMs Do It Differently |
| "I don't have the authority to give labor, all I can do is refund [the customer's] money within a certain | For more than 15 gallons, I can't refund without authorization and I can't suggest to the regional manager what I think we | In one case of a large complaint, "[m]y Regional Manager took my recommendation and together we decided to give the |

| | | |
|---|---|---|
| window." Cox Dep. 59:1-4. | should be refunding the customer. Coggins Dep. 63:14-64:8. | customer 40 gallons to maintain goodwill." Auten Dec. ¶30. |
| As to replacing or reimbursing a product, the Regional Manager lets us make the decision for "[a]nything under 6 gallons." Cook Dep. 29:17-30:4. | "[A]fter I . . . look through like the report form that they'd given us, then yes" we can recommend to the regional manager what I think he should do. Cox Dep. 80:15-19. | For one customer complaint, I thought "it was appropriate to give a refund for the paint, replace the paint with the right color, and pay about $300 for labor" which I suggested to my Regional Manager and he approved. Hurley Dec. ¶45. |
| If the complaint is anywhere up to the eight to ten gallon range, I can handle it over the phone and give the customer a refund. Smith Dep. 126:20-25. | I went on a complaint where the customer "claimed that our paint did such a poor job that it ruined the siding on the house and he had to rip all the siding off . . . and replace it, and wanted us to pay the labor" but after spending 12 or 15 hours on the complaint we "paid him $4,300." McKay Dep. 67:16-68:25. | "Every customer complaint is different, and it is up to me how to handle them and I must use my experience and discretion doing so." Cooper Dec. ¶37. |
| For more than 15 gallons, I can't refund without authorization. Coggins Dep. 63:14-64:8. | | "I am not aware of any cap on my ability to offer a refund or replacement paint to customer. I generally follow common sense and feel comfortable offering up to $1,000 in replacement paint. If it's above $1,000, I will ask the customer to split the cost and if they are unwilling to do that, I will talk about the situation with my Regional Manager." Scribner Dec. ¶25. |

| Filling paint sample displays and reordering samples | |
|---|---|
| Some Pls. Spend Significant Time | Other TMs Spend Little Time |
| "[T]he bulk of my Valspar day was spent doing chips . . . [d]oing chips takes, in a heavy volume store takes five hours to do chips, and there were things, you know, maybe you'd get lucky one week and you'd go into a slower store and doing chips only takes two and a half hours, for example." Cox Dep. 191:7-22. | "When I get the chip order in a store, I set out the chips.  This takes me anywhere form 15 to 30 minutes—maximum— including time I spend multitasking and speaking with customers.  I understand that other Territory Managers have said that [they spend] three hours placing paint chips.  I don't see how that is even possible." Cooper Dec. ¶47. |
| I spend 2 to 2.5 hours servicing the color chips, filling in the color chips, and placing chip orders. Simmons Dep. 45:25-48:20. | "I often delegate the aspects of my job some people might describe as 'rote,' such as refilling paint chips and brochures, to Lowe's associates in order to free up time to go out and make commercial sales calls." Black Dec. ¶29. |
| I describe my job as a "glorified chip filler." Simmons Dep. 205:23-206:8. | |

## G.     Different Territory Managers Were Subject To Different Work Time Policies.

TMs work widely varying hours and have been subject to substantially different "work time" policies during the potential three-year class period.  Valspar generally requires TMs to work a full workweek when they are not on leave.[45]  That policy, however, has not been applied uniformly over time, is applied differently in different regions, and in some cases has been applied differently to different TMs within a single region.

---

[45] Weyrens Dec. ¶6.

Plaintiffs claim they were required to work "a total of over eight hours per day in the Lowe's Stores."[46]  They further allege their commuting time, time spent "responding to business communications via cell phone or e-mail," and time spent "calling on contractors or addressing customer complaints" did not count toward this eight hour per day requirement.[47]  They state they were required to perform "ministerial and reporting functions" in a "home office," that this work "required about 10 to 15 hours each week to complete," and that it could not be counted toward the eight hour per day requirement.[48]  Finally, Plaintiffs state they were "required to commute to Lowe's stores outside [their] Territory" and were therefore "often away overnight, or even a few nights."[49]

Assuming for purposes of this motion that these statements are true, it is clear from the factual record before the Court that different TMs have been subject to different work time policies.  Some TMs have never, to their knowledge, operated under a requirement they spend eight hours per day in a Lowe's store.[50]  Some TMs have testified that, unlike Plaintiffs, they were permitted to and regularly did respond to business e-mails and cell phone calls during their work day in Lowe's stores.[51]  The TM in charge of the Lowe's stores in Northwest Indiana was permitted to count more than half of his

---

[46] Plaintiffs' Dec. ¶¶23.
[47] Plaintiffs' Dec. ¶¶27-29.
[48] Plaintiffs' Dec. ¶¶30.
[49] Plaintiffs' Dec. ¶¶31.
[50] Auten Dec. ¶11, Nieto-Gorski ¶8 ("I am not aware of a requirement that I spend 8.5 hours in a Lowe's store each day.").
[51] Wade Dec. ¶7, Black Dec. ¶6, Hamilton Dec. ¶7, Hurley Dec. ¶34, Compton Dec. ¶7, Cooper Dec. ¶41, Vaughn Dec. ¶33, Nieto-Gorski ¶9.

commuting time as "work time" because of the large commuting distances involved.[52] Several TMs declare they were permitted to count time they spent outside Lowe's stores calling on contractors or resolving customer complaints as work time.[53]  Other TMs state they have never had a home office,[54] rarely performed substantial administrative work at home,[55] or were permitted to count time spent performing administrative work from home toward their normal workday.[56]  Thus, it is clear that the "work time" policies that TMs work under are not uniform, but rather vary substantially from territory to territory and from region to region.

## III.    THE EXEMPTIONS AT ISSUE

Valspar contends that it properly classifies TMs as exempt from the FLSA's overtime requirements under the administrative, outside sales, and combination exemptions.  29 U.S.C. § 213(a)(1); 29 C.F.R. § 541.708.  To determine whether the TMs are properly classified as exempt, the Court will need to separately apply each of these three exemptions to each Plaintiff included in the litigation, and will need to carefully analyze each TM's day-to-day duties and job responsibilities.  *See Smith v. Heartland Auto. Servs., Inc.*, 404 F. Supp. 2d 1144, 1150 (D. Minn. 2005) (Kyle, J.) ("to determine which employees are entitled to overtime compensation under the FLSA depends on an

---

[52] Auten Dec. ¶11.  *See also* Weaver Dec. ¶7 (one of his stores is 2.5 hours away and he "always count[s] the time driving two and from that store, and . . . spend[s] less time in-store as a result").

[53] Lamone Dec ¶27, Weaver Dec. ¶7.

[54] Lamone Dec. ¶6.

[55] Scribner Dec. ¶6, Compton Dec. ¶7, Hurley Dec. ¶34.

[56] Hamilton Dec. ¶7, Weaver Dec. ¶6 (administrative time is "Valspar time" and counts to his in-store hours), Nieto-Gorski Dec. ¶¶7-8.

individual, fact-specific analysis of each employee's job responsibilities under the relevant statutory exemption criteria"); *Keef v. M.A. Mortenson Co.,* No. 07-CV-3915, 2009 WL 465030, *2 (D. Minn. Feb. 24, 2009) (an exemption analysis must be based on each person's actual "day-to-day activities and responsibilities").

To apply these exemptions, the Court will be required to determine the "primary duty" of each Plaintiff. "Determination of an employee's primary duty must be based on *all the facts in a particular case*. . . " 29 C.F.R. § 541.700(a) (emphasis added). The Court will first need to determine whether each job duty performed by the TM constitutes exempt or non-exempt work, in light of the way the TM performs it. The Court must then make a quantitative determination whether the TM performs at least 50% exempt work, requiring an analysis of how much time the TM spends each week on each individual task. *Smith*, 404 F. Supp. 2d at 1148. If a TM does not spend at least 50% of his or her time performing exempt work, the Court must determine whether exempt tasks nevertheless "predominate or define the job." *Id*., *citing* 29 C.F.R. § 541.700. If either condition is met, the TM is properly classified as exempt. *Id*.

A.    **Administrative Exemption**

Individuals employed in an administrative capacity are exempt from the FLSA's overtime payment requirements. 29 U.S.C. § 213(a)(1). Under the U.S. Department of Labor ("DOL") regulations, an employee is exempt when the following requirements are met:

(1) The employee is compensated on a "salary basis" of at least $455 per week;

(2) The employee's "primary duty" is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and

(3) The employee's primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200(a).  The regulations require a highly fact-specific inquiry into each of plaintiff's daily activities.  *See* § 541.202(b) ("[t]he phrase 'discretion and independent judgment' must be applied *in the light of all the facts involved in the particular employment situation in which the question arises*") (emphasis added).  "Identification of administrative work is not a straightforward exercise."  *Carlson v. C.H. Robinson Worldwide, Inc.*, No. 02-cv-3780, 2006 WL 2830015, *4 (D. Minn. Sept. 26, 2006).

Job duties that directly relate to "management or general business operations" include advising management, representing the company, purchasing, promoting sales, and business research and control.  *See, e.g.*, 29 C.F.R. § 541.205(a)–(b); *Reich v. Avoca Motel Corp.*, 82 F.3d 238, 240 n.5 (8th Cir. 1996) (exempt tasks included "resolving guest complaints, engaging in 'public relations' work to gain repeat customers, and making decisions as to the proper presentation of the rooms and common areas"); *Cruz*, 2011 WL 291424, *16 (administratively exempt tasks include "developing business relationships with customers" and "customer training"); *In re RBC Dain Rauscher Overtime Litig.*, 703 F. Supp. 2d 910, 947 (D. Minn. 2010).  The "exercise of discretion and independent judgment" typically involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various

possibilities have been considered. 29 C.F.R. § 541.202(a).  *See, e.g., McAllister v. Transamerica Occidental Life Ins. Co.*, 325 F.3d 997, 1001 (8th Cir. 2003); *Cruz*, 2011 WL 291424, at *16.

**B.    Outside Sales Exemption**

The FLSA exempts from its overtime requirements "[a]ny employee employed  . . . in the capacity of outside salesman." 29 U.S.C. § 213(a)(1). Under the DOL regulations, an employee is an exempt outside salesperson when the following requirements are met:

> (1) The employee's primary duty is making sales, or obtaining orders or contracts for services; and
>
> (2) The employee is customarily and regularly engaged away from the employer's place or places of business in performing such primary duty.

29 C.F.R. § 541.500(a).  It is undisputed that TMs are "customarily and regularly engaged away from the employer's places of business."  To determine whether TMs have a primary duty of making sales, the Court will need to evaluate the "totality of the circumstances" relating to their job duties.  *Ahle v. Veracity Research Co.*, 738 F. Supp. 2d 896, 911 (D. Minn. 2010).

**C.    Combination Exemption**

An employee whose primary duty is neither sales nor administration may qualify as exempt from the FLSA's overtime requirements under the "combination exemption" based upon the combination of his sales and administrative responsibilities.  29 C.F.R. § 541.708; *see Schmidt v. Eagle Waste & Recycling, Inc.*, 599 F.3d 626, 633 (7th Cir. 2010) (finding even if Plaintiff's primary duty was not outside sales, the combination of

her outside sales and administrative work exempts her from the FLSA overtime requirements); *Trinh v. JP Morgan Chase & Co.,* No. 07-CV-1666, 2008 WL 1860161, *4, (S.D. Cal. Apr. 22, 2008).

## IV.   ARGUMENT

**A.   This Court Should Deny Conditional Certification Because The Plaintiffs Are Not Similarly Situated With Respect To The Applicable Exemption Analyses**

Plaintiffs seek conditional certification pursuant to Section 216(b) of the FLSA. "The fundamental inquiry in determining whether a collective action under § 216(b) is appropriate is whether or not the plaintiffs are 'similarly situated.'" *Smith*, 404 F. Supp. 2d at 1149.  In an exemption case, Plaintiffs must establish they are similarly situated in respects that are relevant to the exemption inquiry. *Id*. at 1152-53.

TMs are not similarly situated with respect to the applicable exemption inquiries, and Plaintiffs have done nothing to show that they are.[57]  Plaintiffs point to several areas in which TMs are nominally similar to one another, such as the fact they all have the same job title and received similar training.  Pl. Br. at 12.  As this Court has recognized, however, those factors are not relevant to an exemption analysis.  *Smith*, 404 F. Supp. 2d at 1151; *Cruz*, 2011 WL 291424, at *9.  Rather, to determine each TM's exempt status,

---

[57] Plaintiffs correctly point out that at the first stage of an FLSA certification analysis, the Court does not weigh the merits or resolve factual disputes.  Pl. Br., 15 n.6.  Defendant is not asking the Court to do either of those things, however.  At this stage, the Court needs to take the exemptions at issue into account not to determine whether TMs are in fact properly classified as exempt, but rather to determine whether the factual record demonstrates that TMs' mix of job duties and the way they perform them are sufficiently similar that it would be feasible to adjudicate their exempt status on a class-wide basis.

this Court will need to engage in an individualized and fact-specific inquiry into each TM's particular mix of job duties, as well as the way he or she performed them. *Id.*

The factual record before the Court makes it clear that TMs operate in unique geographic territories, have significant autonomy, have significantly different mixes of job duties, and take substantially different approaches to their jobs. *See* Section II(E)-(F), *supra*. These legally significant factual differences make it impossible for the Court to efficiently manage this case as class litigation, or to resolve the exempt status of all TMs in a single adjudication. Accordingly, conditional certification should be denied.

1.   <u>Conditional certification is a discretionary decision, and should be denied where no showing has been made that a case can be efficiently managed as collective litigation.</u>

This Court has repeatedly recognized that "[d]etermining whether a representative action is the appropriate means for prosecuting an action is in the court's discretion." *Ray v. Motel 6 Operating, Ltd. P'ship,* No. 3-95-828, 1996 WL 938231, *2 (D. Minn. Mar. 18, 1996); *Smith,* 404 F. Supp. 2d at 1149 (same). "The power to authorize notice . . . 'is to be exercised . . . only in 'appropriate cases,' and remains within the discretion of the district court.'" *Parker v. Rowland Express, Inc.*, 492 F. Supp. 2d 1159, 1163 (D. Minn. 2007) (Kyle, J.), *quoting West v. Border Foods, Inc.,* No. 05-2525, 2006 WL 1892527, *2 (D. Minn. July 10, 2006); *see also Severtson*, 137 F.R.D. at 266. In making this appropriateness determination, the Court must be particularly cognizant of the "expense and effort [to a defendant employer] of notice to a conditionally certified class of claimants." *Parker*, 492 F. Supp. 2d at 1165.

The hallmark of this appropriateness determination is manageability.  "[T]he court must . . . look to specific factual similarities or differences and manageability concerns." *Ray*, 1996 WL 938231, at *4.  "As a matter of sound case management, a court should, before offering [assistance in locating additional plaintiffs], make a preliminary inquiry as to whether a manageable class exists." *Severtson*, 137 F.R.D. at 266.  Plaintiffs must show **not only** that there is a "colorable basis" for a collective action, **but also** "that factual similarities or differences among the putative Plaintiffs are such that the case may be properly managed as a collective action."  *West*, 2006 WL 1892527, at *3, *citing Ray*, 1996 WL 938231, at *4 and *Severtson*, 137 F.R.D. at 266.

To demonstrate manageability, Plaintiffs must show "some identifiable facts or legal nexus" that "bind[s] the claims so that hearing the cases together promotes judicial efficiency."  *West*, 2006 WL 1892527, at *3.  Where it is clear that claims will ultimately prove unmanageable, courts should deny certification so as avoid unnecessarily "subjecting an employer to the burdens of a collective action."  *West*, 2006 WL 1892527, at *9; *see also Parker*, 492 F. Supp. 2d at 1165 (courts should avoid "an inefficient and overbroad application of the opt-in system," which threatens to "place[] a substantial and expensive burden on a defendant").

2.    <u>Plaintiffs bear the burden of coming forward with factual evidence showing they are similarly situated with respect to the class they seek to represent.</u>

To secure conditional certification, "the named plaintiffs must first show that they are 'similarly situated to the employees whom [they] seek[] to represent.'"  *Parker*, 492 F. Supp. 2d at 1163, *quoting Mares v. Caesars Entm't, Inc.,* No. 4:06-cv-0060, 2007 WL

118877, *2 (S.D. Ind. Jan. 10, 2007). "Plaintiffs bear the burden of establishing that they are similarly situated." *Smith*, 404 F. Supp. 2d at 1149. Specifically, at the first stage of a Section 216(b) inquiry Plaintiffs are required to establish "a colorable basis for their claim that a class of similarly situated plaintiffs exist." *Id*. "The determination of 'similarly situated' is achieved by analyzing various factors on a case by case basis." *Ray* 1996 WL 938231, at *3.

While the burden on Plaintiffs to produce facts showing they are similarly situated to the class they seek to represent is "not onerous," it also is "not invisible." *Parker,* 492 F. Supp. 2d at 1164. "Plaintiffs must come forward with at least some evidence indicating that this is an 'appropriate case' for collective-action status." *Parker,* 492 F. Supp. 2d at 1164, *quoting West*, 2006 WL 1892527, at *2. *See also Severtson v. Phillips Beverage Co.*, 137 F.R.D. 264, 267 (D. Minn. 1991) (it is "particularly appropriate" to require Plaintiffs to make a factual showing where "defendants have challenged the allegations of the complaint by submitting affidavits and deposition testimony" tending to show the absence of uniform injury to the proposed class).

    3.    <u>The Court should consider all factual evidence – including evidence presented by Defendant – in making its "similarly situated" and manageability determinations.</u>

This Court has repeatedly recognized that, in light of the manageability and efficiency concerns that underlie a discretionary conditional certification determination, the Court should review the entire factual record before making a certification decision. While a Court does not make *factual findings* at the conditional certification stage, this Court has recognized that "neither the remedial purposes of the FLSA, nor the interests

of judicial economy, would be advanced if we were to overlook facts which generally suggest that a collective action is improper." *West*, 2006 WL 1892527, at *7.  Thus, the Court has noted that it "is unaware of any court that has [ruled] that evidence submitted by a defendant resisting conditional certification should be completely ignored." *Saleen v. Waste Mgmt., Inc.*, 649 F. Supp. 2d 937, 942 (D. Minn. 2009).  *See also Basco v. Wal-Mart Stores, Inc.*, No. Civ. A. 00-3184, 2004 WL 1497709, *5 (E.D. La., July 2, 2004) ("To create a collective action class, including the costs associated with that when a Court is convinced that there is insufficient support for same prior to its certification would be an exercise in futility and wasted resources for all parties involved"); *West*, 2006 WL 1892527, at *7 (where "the facts before the Court are extensive . . . there is no need for discovery in order to reach a determination"); *Ray*, 1996 WL 938231, at *3.  In making its conditional certification decision, the Court should consider not only the affidavits that have been submitted by Plaintiffs, but also the Plaintiffs' deposition testimony and the additional TM affidavits that have submitted by Valspar.

> 4.  <u>Territory Managers are not similarly situated with respect to the applicable exemptions because of their diverse job duties and significant autonomy.</u>

"[T]o determine which employees are entitled to overtime compensation under the FLSA depends on an individual, fact-specific analysis of each employee's job responsibilities under the relevant statutory exemption criteria." *Smith*, 404 F. Supp. 2d at 1150.  *See also Keef v. MA. Mortenson Co.,* No. 07-CV-3915, 2009 WL 465030, at *2 (D. Minn. Feb. 24, 2009) (an exemption analysis must be based on each person's actual "day-to-day activities and responsibilities").  The factual record before the Court

demonstrates that TMs have diverse job responsibilities, a varying mix of job duties, and exercise their discretion to perform their jobs in very different ways. *See* Section II(F), *supra*. For example, many TMs devote substantial time to building relationships with Lowe's store managers and district managers so that they can persuade them to adopt their in-store sales and marketing ideas. *Id*. Others do not. *Id*. Many TMs spend a substantial amount of time analyzing sales data from each of their assigned stores so they can make targeted marketing decisions to increase sales of underperforming product lines, maximize the exposure of products that are selling well, and proactively make inventory adjustments that will maximize the "return on investment" for both Valspar and Lowe's. *Id*. Others do not. *Id*. Many TMs entrepreneurially seek out contractors in their territory to pitch Valspar products to them and increase sales. *Id*. Others do not. *Id*. Some TMs allege that they average two to three hours a day filling paint sample displays. *Id*. Other TMs say they spend very little time on such responsibilities – no more than 15 to 30 minutes in a typical day. *Id*. These are only a few of the many job-duties disparities that will make joint adjudication of the exempt status of TMs impossible, and render the treatment of this lawsuit as collective litigation unmanageable.

This Court recently recognized that an exemption case was "inappropriate for collective adjudication" because the employees' jobs "var[ied] in material ways," the employees were "minimally supervised" in their "day-to-day activities," and multiple exemptions were "likely to apply to some, but not all, [putative class members] and will require fact-intensive inquiry." *Cruz*, 2011 WL 291424, at *1, 7. The Court noted that the finder of fact would "have to decide whether each Plaintiff engages in exempt work

30

as his or her 'primary duty' in light of 'all the facts in a particular case,'" and would need to "examine the relative importance of exempt duties, the amount of time spent performing exempt work, and the level at which the employee is subject to direct supervision." *Id.* at *8, *quoting* 29 C.F.R. § 541.700(a). The Court further noted that in applying the administrative exemption, it would "need to assess each Plaintiff's level of discretion" in carrying out their work, as well as whether they "resolve[d] issues of significance" in the context of their "unique employment situation," including the particular nature of their "interactions with [Defendant's] customers." *Id.* at *9. The Court determined that it would be impossible to "efficiently adjudicate[] en masse" the exempt status of the Plaintiffs "because the exemption analysis is fact-driven and Plaintiff-specific," requiring "individualized mini-trials" to resolve the case. *Id. See also Smith*, 404 F. Supp. 2d at 1154 (although plaintiffs "have made a showing of similarity with respect to some aspects of their positions," certification would be denied because they failed to show they are "similarly situated to the extent necessary to make collective treatment of their claims proper and efficient under § 216(b) of the FLSA").

While *Cruz* and *Smith* were decided in the context of deciding decertification motions at the second stage of an FLSA certification analysis, a court deciding a conditional certification motion should not blind itself to the ultimate inquiry it will be required to make, particularly where there has already been significant factual development. *West*, 2006 WL 1892527, at *7; *Saleen* 649 F. Supp. 2d at 942; *Ray*, 1996 WL 938231, at *3. Here, eight of the twelve named Plaintiffs have been deposed, and more than 180 pages of detailed, personalized TM declarations having been submitted by

Valspar.  The factual record before the Court establishes that TMs have widely variable job duties and are not similarly situated with respect to the applicable exemption inquiries.  Indeed, the one characteristic all TMs have in common is their autonomy in performing their jobs – a commonality that Plaintiffs cannot (and do not) deny—a factor that weighs strongly against certification.  *Id*. at *3.  Allowing this case to proceed as collective litigation, even at the notice stage, would waste judicial resources and result in unnecessary and burdensome expenses to Defendant.  Conditional certification should be denied.

> 5.   The geographic diversity of the proposed class, and the fact that each TM has responsibility for several unique Lowe's stores, weighs against certification.

The proposed class is completely unmanageable on a collective basis because every TM works in a unique geographic territory, and is charged with servicing between 3 and 10 unique Lowe's stores faced with a variety of local circumstances affecting sales.[58]  This Court has repeatedly denied conditional certification where the geographic diversity renders the putative class members sufficiently dissimilar such that collective adjudication would be unmanageable.  For example, this Court has denied conditional certification where the named plaintiffs were employed "in five different regions" in "at least twenty different states," working at "thirty-nine different properties . . . that vary widely as to the number of rooms and budgets."  *Ray*, 1996 WL 938231, at *4 (noting that putative plaintiffs worked in "different local offices" in "different geographic

---

[58] Scribner Dec. ¶¶13, 17, Auten Dec. ¶25, Hamilton Dec. ¶20, Vaughn Dec. ¶14, Weaver Dec. ¶¶11, 18.

locations," with "different supervisors and salaries"), *quoting Ulvin v. Nw. Nat'l Life Ins. Co.*, 141 F.R.D. 130, at 131 (D. Minn. 1991). *See also Saleen v. Waste Mgmt., Inc.*, 649 F. Supp. 2d 937, 942 (D. Minn. 2009) (denying conditional certification where "plaintiffs are not seeking to certify a class of people who work under one particular manager, or who work at one particular plant, or who work under one particular collective-bargaining agreement, or even who work in one particular state").

Where relevant conditions affecting the legal issues in the case are likely to vary "from individual to individual, manager to manager, and facility to facility," the claims raised "should not proceed as a single, nationwide collective action." *Saleen*, 649 F. Supp. 2d at 942-43. *See also Lawrence v. City of Phila.*, No. 03-CV-4009, 2004 WL 945139 at *2 (E.D. Pa., Apr. 29, 2004) (denying certification where "[t]he circumstances of [plaintiffs'] individual claims potentially vary too widely to conclude that . . . the Plaintiffs are similarly situated"). Here, the diversity within the putative class is greater with respect to both geographical location and the diversity of the work environments in which the putative class members are employed than in other cases in which conditional certification has been denied.

6.   The diverse work time policies that apply to Territory Managers weigh against certification.

The factual record before the Court shows that TMs in different regions, and even different TMs within the same region, worked substantially different hours, and were subject to substantially different work time policies. *See* Section II(G), *supra*. These factors make a class-wide determination of hours worked by TMs impossible, and weigh

against conditional certification. *Ray*, 1996 WL 938231, at *4 (denying conditional certification where "the amount of overtime hours worked varies between Plaintiffs, which demonstrates a lack of commonality for damages"). Furthermore, the record shows that different regional managers applied Valspar's "full workweek" policy differently to different TMs, depending on a variety of territory-specific circumstances. *See* Section II(G), *supra*. This Court has noted that where the implementation of a corporate plan "occurred on a decentralized level by local management, rather than through central authority," that is a factor that weighs against certification. *Ray*, 1996 WL 938231, at *3, *citing Ulvin*, 141 F.R.D. at 131.

    7.    <u>The common characteristics identified by plaintiffs are not relevant to the exemption inquiry.</u>

    Plaintiffs do not even *attempt* to provide any analysis showing how they are similarly situated with respect to the exemption inquiry at the heart of this case. Instead, Plaintiffs point out several characteristics they assert all TMs have in common, without explaining how any of those characteristics are relevant. Pl. Br., 12-13.

    For example, Plaintiffs assert that they all have the same job title, *id.* at 12, received similar job training, *id.*, and report through the same Valspar "management system," *id.* at 6. These purported similarities are legally insufficient to support a finding that Plaintiffs are similarly situated to other potential class members, and this Court has previously rejected the relevance of each. It is "[o]bvious" that the mere fact that all of the putative plaintiffs were subject to a single policy or plan "cannot be sufficient to justify conditional certification." *Saleen*, 649 F. Supp. 2d at 940. "Any two people who

work at the same time for the same employer are going to be subject to *some* common policies. That does not mean that a class may be conditionally certified any time two employees of the same company bring an FLSA action." *Id*. Thus, this Court has held that conditional certification is not warranted simply because plaintiffs were all employed in "the same position" by "the same corporate entity" pursuant to "a similar management plan." *Ray*, 1996 WL 938231, at \*4. *See also West*, 2006 WL 1892527, at \*7-\*8 (fact that plaintiffs worked in the same position for the same corporate entity under a similar management plan is irrelevant where the nature of the plaintiffs' claims requires an individualized inquiry). Plaintiffs have simply failed to meet their burden of presenting the Court with *facts* showing that that they are similarly situated to other TMs, as is required to support conditional certification under Section 216(b).

Plaintiffs also assert that they all perform "nearly identical" job duties, P. Br., 4, 12-13; Plaintiffs' Dec. ¶¶5, 10-12, but they provide no supporting analysis for this contention, and it is clear from their citation to paragraphs 10 and 16 of their carbon-copy declarations that this statement means nothing more than that they each performed the same eighteen broadly described tasks that are set forth in their declarations. The applicable exemption analyses are fact- and plaintiff-specific, however, and turn not on a list of job duties, but rather on the particular *mix* of job duties performed by each TM and *how* each TM performed those job duties in practice. Plaintiffs do not provide any details in their declarations concerning how much time they spend on each duty, or how they go about performing such broadly described duties as "event and brand marketing," building

"rapport" with Lowe's management, "training Lowe's Associates,"[59] "cross-merchandising," "holding in-store clinics," and "address[ing] customer complaints."[60] Indeed, Plaintiffs' own declarations and deposition testimony plus numerous declarations submitted by other TMs showing the wide variability defeats any notion that TMs perform those. *See* Section II(F).

### 8. Plaintiffs inaccurately describe, and inappropriately rely on, *Seymour v. PPG Industries, Inc.*

Plaintiffs argue that this Court should grant conditional certification because another district court has done so in an allegedly similar case, *Seymour et al. v. PPG Industries, Inc.*, No. 09-cv-01707 (W.D. Pa. filed Dec. 30, 2009) (Request for Judicial Notice ("RJN") Ex. A.). Specifically, Plaintiffs allege that the *Seymour* court entered a "[f]inding that the Territory Managers in *Seymour* met the criteria for 'similarly situated'" and conditionally certified the class. Pl. Br., 14. Plaintiffs' assertion that the district court entered a "similarly situated" finding is untrue. In fact, Defendant PPG did not contest whether the Olympic Paint Territory Managers at issue in *Seymour* were similarly situated. Instead, PPG's opposition brief argued that it was inappropriate for notice to issue because notice had already issued to an identical and overlapping class in a previously filed case, *Duarte v. PPG Industries, Inc.*, No. 09-CV-1366-JTM-DWB (D.

---

[59] As with all of these duties, training can be exempt or non-exempt work, depending on how it is performed. *Compare Rozenblum v. Ocean Beach Properties*, 436 F. Supp. 2d 1351, 1361 (S.D. Fla. 2006) (Plaintiff exercised discretion by "deciding the methods for training employees and how long to train [employees]"), *with Hashop v. Rockwell Space Operations Co.,* 867 F. Supp. 1287 (S.D. Tex. 1994), (instructors were not exempt because, "they had no discretion to change how or when simulations were operated or to modify them in any other way").

[60] Plaintiffs' Dec. ¶¶5, 10-12.

Kan. 2010).  (RJN Ex. B.).  The court thus did not enter a finding that the Territory Managers were similarly situated, presumably because the issue was never raised by the parties.

The related *Duarte* case also does not contain any authority supporting Plaintiffs' proposition.  In *Duarte*, PPG stipulated that notice should issue "[t]o avoid the expense associated with motion practice."  (RJN Ex. C.).  The court did not enter a "similarly situated" finding because, once again, the parties never raised the issue with the court.

While *Seymour* has no precedential value for deciding this case, it is worth noting that even though that case involved different employees of a different employer, Plaintiffs in this case have copied *virtually verbatim* the list of job duties provided by the *Seymour* plaintiffs in their affidavits, in neatly lettered paragraphs (a) – (o), with only two changes:  The word "Olympic" has been replaced with the word "Valspar" each place that it appears, and Plaintiffs have added a paragraph (n) to their affidavits (but, strangely, not to their brief) claiming that Valspar TMs are required to work "a certain number of Saturdays per year."  (*Compare* Pl. Br at 3-4 *with* RJN Ex. D.).  This Court should reject Plaintiffs' inappropriate attempt to secure conditional certification in this case by copying wholesale a list of job duties performed by the employees of a different employer, particularly where Plaintiffs have not provided this Court with any elaboration as to the amount of time Valspar TMs spend on the listed duties, or any description of the manner in which they perform them.

**B.**     **If the Court Grants Conditional Certification, It Should Not Use The Notice Prepared By Plaintiffs, Which Is Highly Misleading And Misstates The Law.**

Plaintiffs' proposed notice must be rejected because it is misleading, confusing, and would prevent potential opt-ins from "receiving accurate . . . notice concerning the pendency of the collective action, so that they can make informed decisions about whether to participate." *Hoffman-La Roche Inc. v. Sperling,* 493 U.S. 165, 170 (1989). If this Court orders that notice should issue, the Court should instead use the notice submitted by Valspar, which is modeled on the notice previously approved by this Court in *Lyons v. Ameriprise Financial, Inc.*, No. 10-cv-00503-RHK-JJK (Dkt. 94) (D. Minn. Oct. 8, 2010) (RJN Ex. E) (the "*Lyons* notice"), attached as Ex. 36 to Fife Dec., and which accurately and objectively informs opt-ins of the pending lawsuit and their eligibility to join.

  1. <u>Plaintiffs' notice misinforms employees that they may lose their rights if they do not join the lawsuit, while minimizing the responsibilities of opt-in plaintiffs.</u>

Plaintiffs' notice begins by stating: "If you are or were employed by Valspar Corporation as a Lowe's Territory Manager . . . a lawsuit may affect your rights." Plaintiffs' Proposed Notice, Dkt. 36-1. Also on the first page, Plaintiffs declare "your legal rights may be affected, and you have a choice to make now." *Id.* These lines are misleading in the context of an opt-in collective action, since a putative class member who does nothing will not be bound by any judgment and will remain free to bring his or her own suit.

Plaintiffs' notice also misleadingly minimizes the responsibilities and consequences associated with joining the lawsuit. Plaintiffs provide a summary on the first page of the notice that portrays the result of joining the lawsuit as passively "awaiting the outcome," Dkt. 36-1 at 1, which fails to inform potential opt-ins that a consequence of joining the lawsuit is an obligation to provide information, respond to discovery requests, sit for depositions, or testify in court.[61] The notice further informs potential opt-ins of their opportunity to recover money on at least five occasions, Dkt. 36-1 at 1, 3, 4, while listing their obligation to participate in discovery and/or trial only once. *Id*. at 4-5.

2.     <u>Plaintiffs' proposed notice contains excessive information that presents a biased view of the case.</u>

The proposed notice states "the Court has determined preliminarily that present and former Lowe's Territory Managers . . . who, in the past three years, have allegedly been misclassified as exempt employees under the FLSA, and thereby been denied payment . . . may have suffered sufficiently similar claims." Dkt. 36-1 at 2. Plaintiffs' characterizations that the Court has made a preliminary determination that the putative class "suffered" similar claims and has been "denied payment" are an obvious attempt to generate interest through the use of loaded and misleading language.

Also, Plaintiffs promote their position throughout the notice by describing their claims in detail on no less than four occasions. Yet, Valspar's denial of liability is mentioned only once. *Compare id*. at 1-3 *to id*. at 3. Similarly, Plaintiffs' notice

---

[61] Plaintiffs do not even hint at such responsibilities until pages four and five of their proposed notice. Dkt. 36-1 at 4-5.

repeatedly states that twelve plaintiffs are currently involved in the case, at one point listing each by name, in an apparent attempt to inject a perception of legitimacy into their claims through the invocation of numbers. *Id*. at 1-2.

> 3.      Plaintiffs portray their attorneys as representing all opt-ins.

Plaintiffs' notice inaccurately portrays their counsel as already representing putative opt-ins, describing class as "THE LAWYERS REPRESENTING YOU," immediately followed by their attorneys' contact information. Dkt. 36-1 at 5. The notice further inappropriately promotes Plaintiffs' counsel by claiming "you do not need to hire your own lawyer because [plaintiffs' counsel] have agreed to work on your behalf," *id*., and emphasizing that opt-ins who choose their own counsel will be burdened with "making the arrangements to hire that lawyer, including any fee arrangements." *Id*. Plaintiffs' notice also inaccurately states that any opt-in who selects separate counsel must have that attorney "draft a consent form that you should then mail to [Plaintiffs' counsel]," *id*., when in fact no such obligation exists. *See also* Plaintiffs' Proposed Consent Form, Dkt. 36-2 at 2.

> 4.      Plaintiffs seek to mail the notice to individuals who are outside the
>         limitations period and seek and unnecessarily long notice period.

The statute of limitations for an FLSA claim is two years, unless a "willful" violation is proven, in which case it extends to three years. 29 U.S.C. § 255(a). Plaintiffs fail to limit the notice to those employed within the applicable statute of limitations by defining the class as current or former Lowe's Territory Managers employed from July 1,

2007 to the present.  Dkt. 36-1 at 1.  July 1, 2007 is well-beyond the applicable limitations period, which is presently March 2008.

Plaintiffs also propose an unnecessarily long period of ninety (90) days for potential opt-ins to submit their consent forms.  Dkt. 36-1 at 4.  *See Martinez v. Cargill Meat Solutions,* 265 F.R.D. 490, 501 (D. Neb. 2009) (to avoid "substantially delay[ing] the progress of this litigation," "plaintiffs' notice will set a forty-five day deadline for recipients to consider, complete and mail their 'Opt-in Consent Forms'"); *see also DeKeyser v. Thyssenkrupp Waupaca, Inc.,* 2008 U.S. Dist. LEXIS 102318, *6 (E.D. Wis. Dec. 17, 2008) (45 days); *Williams v. Long,* 585 F. Supp. 2d 679, 691 (D. Md. 2008) (30 days).   In light of Plaintiffs' and their lawyers' active recruiting attempts over the last five months, a forty-five day notice period is more than adequate to allow other TMs (all of whom are already aware of the lawsuit and many of whom have already been contacted by Plaintiffs and their lawyers) to make a decision about joining.[62]

**C.    If the Court Grants Conditional Certification, The Court Should Allow Valspar To Produce Class Information To A Third-Party Administrator.**

Plaintiffs have asked this Court to order Valspar to produce the names, addresses, and salary histories of Territory Managers.  If the Court permits notice, it should appoint a third-party administrator to receive the class information from Valspar to ensure that confidential, private employee information is protected.  *See Robinson v. Empire Equity Group, Inc.,* No. WDQ-09-1603, 2009 WL 4018560, *5 (D. Md. Nov. 18, 2009) (parties' "plan [for issuing notice] should include safeguards for the privacy of potential class

---

[62] McKay Dep. 20:11-21:3, 26:1-8, 27:15-24, Jack Smith Dep. 12:20-14:21.

members, such as a requirement that notices be mailed by a neutral third-party administrator"); *In re Am. Family Mut. Ins. Co. Overtime Pay Litig.*, MDL Docket No. 1743, 2009 WL 248677, *4 (D. Colo. Feb. 3, 2009) ("use of a third-party administrator is appropriate to protect the integrity of the process and to protect the confidential information of potential opt-in plaintiffs"); *In re Pilgrim's Pride Fair Labor Standards Act Litig.*, MDL No. 1:07-CV-1832, 2008 WL 2061265, *1 (W.D. Ark. May 14, 2008) (notice issued via administrator). The Court should also deny Plaintiffs' request for the salary information of putative class members, as such information is intensely private, the putative class members have not consented to its disclosure, and it would not in any way facilitate notice to the class.

Valspar has an obligation to protect the confidential nature of personnel information entrusted to its employees. *See Gehring v. Case Corp.*, 43 F.3d 340, 342 (7th Cir. 1994) (stating disclosure of non-party employees' personnel files "would invade the privacy of the other employees"); *Chavez v. Daimler Chrysler Corp.*, 206 F.R.D. 615, 622 (S.D. Ind. 2002) ("Defendant's privacy concerns in its employment records are well-founded"). The Supreme Court has also held that individuals have a privacy interest in not having names and addresses disclosed without their consent, including by their employers and even to individuals seeking to represent their interests. *United States Dep't of Defense v. Fed. Labor Relations Auth.*, 510 U.S. 487, 501 (1994). The Supreme Court recognized the sensitive nature of employee addresses:

> Many people simply do not want to be disturbed at home by work-related matters. Employees can lessen the chance of such unwanted contacts by not revealing their addresses to their exclusive representative. Even if the

direct union/employee communication facilitated by the disclosure of home addresses were limited to mailings, this does not lessen the interest that individuals have in preventing at least some unsolicited, unwanted mail from reaching them at their homes. We are reluctant to disparage the privacy of the home, which is accorded special consideration in our Constitution, laws, and traditions.

*Id.* If the Court permits notice to issue, it should protect this right to privacy by appointing a third-party administrator.  In the alternative, if the Court does order Valspar to produce some or all of the requested class information directly to Plaintiffs' counsel, the Court should order that the information produced can only be used by Plaintiffs for the specific purpose of sending court-approved notice to the putative class.

## V.    CONCLUSION

For all of the foregoing reasons, Plaintiffs' motion requesting conditional certification of a nationwide class of Valspar Territory Managers should be denied.


Date:  March 11, 2011                           WINSTON & STRAWN LLP

                                                By:   /s/  Joan B. Tucker Fife
                                                     Joan B. Tucker Fife
                                                101 California Street,
                                                San Francisco, CA 94111-5802


                                                DORSEY & WHITNEY LLP
                                                Robert R. Reinhart
                                                50 South Sixth Street, Suite 1500
                                                Minneapolis, MN 55402-1498


                                                Attorneys for Defendant
                                                Valspar Corporation