## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| Shane Simmons, Chris Cook, Larry Basil, Jerry Candelaria, Brian Clark, Tim Coggins, Yvonne Marrone, Thomas Martinez, Steve McKay, Jack Smith, John Smith and Paul Smith on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>The Valspar Corporation,<br><br>Defendant. | Civil Action No. 10-3026 RHK/SER<br><br>**The Honorable Richard H. Kyle**<br><br>**DEFENDANT THE VALSPAR CORPORATION'S MEMORANDUM IN SUPPORT OF MOTION FOR DECERTIFICATION OF COLLECTIVE ACTION** |

## I.   INTRODUCTION

Plaintiffs are 68 current and former Valspar Territory Managers ("TMs").  They held the same job title and were expected to drive sales of Valspar paint to Lowe's, but the commonalities end there.  Plaintiffs cannot meet their burden of proving they are similarly situated such that collective treatment is manageable and efficient.

Plaintiffs' claim for overtime wages turns on whether they are properly classified as exempt under three possible exemptions:  outside sales, administrative and combination.  Determining whether a particular TM is exempt is highly fact-specific and requires a determination of what each did on a day-to-day basis.  This is especially true here because Plaintiffs claim their duties differ from Valspar's expectations.  Plaintiffs performed their job duties in very different ways because they worked in the field virtually unsupervised and they had much discretion in how to spend their day.

Plaintiffs admitted different views of the TM job.  For example:

| Duty | Differences | | |
|------|-------------|---|---|
| **Sales** | "We are in [Lowe's] to sell paint.  I'm not going to lie to you.  We are in there to sell paint…I was in there to increase sales which I hopefully did." [1] | vs. | "It's not my job to sell to the customer."[2] |
| **Analyzing Data (Administrative Duty)** | It "would really take a lot of time going through the numbers and a lot of drilling down and different sheets" in the system with sales data.[3] | vs. | Went "through the motions to make them think that [he] was hitting" reports in the system.[4] |
| **Ordering Inventory (Sales or Administrative Duty)** | "We sometimes did orders if we could get the ordering done."[5] | vs. | "I can't do any ordering of the paint."[6] |

These are only a few of the many differences in how Plaintiffs executed their job duties.

Each difference affects individual Plaintiffs' exempt status and which exemption applies.

The action should be decertified because Plaintiff-specific defenses will overtake

the action.  Individualized testimony will be required to determine a particular Plaintiff's

exemption, as well as whether and how much overtime she worked each week.  The fact-

finder will have to scrutinize each Plaintiff's credibility because individual Plaintiff's

---

[1] Hanchey, 175:2-16.  All relevant deposition excerpts are attached to the Declaration of Joan Fife.
[2] Nodler, 76:24-77:1.
[3] Crossfield, 103:8-109:7.
[4] McLain, 54:11-23.
[5] Candelaria, 32:3-4.
[6] P. Smith, 96:3-4.

deposition testimony contradicts written discovery responses, signed declarations, reports to Valspar of their "sales," and resumés touting sales experience.[7]

Plaintiffs cannot show they are similarly situated.  This case will devolve into 68 mini-trials, cannot be tried collectively, and should be decertified.

## II.  BACKGROUND

Plaintiffs allege TMs were misclassified as exempt and entitled to overtime. Applying the lenient first-stage standard for conditionally certifying collective actions, the Court authorized notice to be sent TMs on April 11, 2011.

Valspar produced a list of 402 individual TMs, but only 68 (16.4%) consented to join the suit.[8]  Since then, 12 TMs (or 24% of those who were noticed for post-certification depositions) dismissed their claims.[9]

Discovery is over, and Plaintiffs bear a heavier burden of establishing they are similarly situated under the stricter second-stage standard for certification.

## III.  MERITS ISSUES AFFECTING COLLECTIVE TREATMENT

**A.**    **Three Separate Exemptions Require Fact-Intensive Analysis and Plaintiff-by-Plaintiff Application.**

Because employees are not entitled to overtime if they are properly classified "exempt" (29 U.S.C. §213(a)), the Court must determine whether Plaintiffs are similarly situated with respect to three exemptions that might apply to each TM.  Determining whether an exemption applies is fact-specific, looking to the totality of the circumstances

---

[7] Coffey, 67:16-68, Ex. 2; *see also* Fife Dec. ¶8.
[8] Fife Dec. ¶2.
[9] Fife Dec. ¶2.

and each employee's day-to-day duties.  *Schaefer-LaRose v. Eli Lilly & Co.*, 679 F.3d 560, 572 (7th Cir. 2012).

| **Outside Sales** | **Administrative** | **Combination** |
|---|---|---|
| Applies to any employee: (1) Whose primary duty is: (i) making sales within the meaning of section 3(k) of the Act, or (ii) obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer; and (2) Who is customarily and regularly engaged away from the employer's place or places of business in performing such primary duty. 29 C.F.R. §541.500(a). The term "'[s]ale' or 'sell' *includes* any sale, exchange, contract to sell, consignment for sale, shipment for sale, or *other disposition*."  29 U.S.C. §203(k) (emphasis added). | Applies to any employee whose primary duty: (1) is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and (2) includes the exercise of discretion and independent judgment with respect to matters of significance. 29 C.F.R. §541.200(a). [10] Exempt job duties include *advising management*, *representing the company*, purchasing, *promoting sales*, *business research* and control (*Shaefer-LaRose*, 679 F.3d at 574), *customer training* (*Cruz v. Lawson Software*, 764 F. Supp. 2d 1050, 1069 (D. Minn. 2011), and public relations. *Reich v. Avoca Motel*, 82 F.3d 238, 240 n.5 (8th Cir. 1996) (all emphases added). | An employee whose primary duty is neither sales nor administration may still qualify as exempt based upon the combination of his sales and administrative responsibilities.  29 C.F.R. §541.708; *see Schmidt v. Eagle Waste & Recycling*, 599 F.3d 626, 633 (7th Cir. 2010) (even if plaintiff's primary duty was not outside sales, the combination of outside sales and administrative work exempts her from overtime requirements). |

Since conditional certification, the Supreme Court considered the outside sales exemption and rejected a formalistic and narrow interpretation of the word "sale" because

---

[10] The exemption has a salary requirement that is undisputed.

the FLSA's use of the words "*includes*" and "*other disposition*" (see chart above) indicates Congress's intent to define "sale" broadly.  *Christopher v. SmithKline Beecham*, 132 S.Ct. 2156, 2171 (2012).  Obtaining a non-binding commitment to buy constitutes a "sale" even if the employee does not transfer property to the buyer.  *Id.* at 2170.

Since conditional certification, the Seventh Circuit held the administrative exemption applies where the job does not fit perfectly into regulation-enumerated duties, especially where employees "are the principal ongoing representatives of the company" to the market for the company's product and/or where the "goal of their work is to increase market share indirectly or, stated differently, promote sales."  *Schaefer-LaRose*, 679 F.3d at 575-77 (pharmaceutical sales representatives' job duties are "sufficiently similar" to work described in regulations as administrative to suggest their "work is directly related to the general business operations of the pharmaceutical companies").

"[E]xercise of discretion and independent judgment" in the administrative exemption includes:

- Conversing with persons who are in the most direct position to determine whether products have a viable market;

- Delivering the company's message with precision, and tailoring the message to the company's target audience; and

- Spending the vast majority of time unsupervised.  *Id.* at 577-581.

**B.     The Fact-Finder Will Ultimately Have to Consider Overtime Damages (Assuming Liability is Established), Plaintiffs' Credibility, and Other Individual Defenses.**

Collective treatment is inappropriate where the fact-finder must consider other

individualized issues, including:

- Whether individuals actually worked overtime.  *Douglas v. First Student*, 4:09CV00652-BSM, 2012 WL 3765029, *6 (E.D. Ark. Aug. 23, 2012).

- How much overtime any individual worked from week-to-week.

- Plaintiffs' credibility, especially where documentary evidence contradicts their claims.  *Smith v. Heartland Automotive Svcs.*, 404 F. Supp. 2d 1144, 1154 (D. Minn. 2005).

- Other Plaintiff-specific defenses.  *Id.* at 1150.

## IV.  FACTS

**A.     TMs' Role at Valspar**

Valspar manufactures paints and stains sold at Lowe's stores.  Valspar employs

TMs to drive sales of Valspar products within assigned geographical territories that

include several Lowe's stores.[11]  TMs are the primary Valspar representatives in their

territory, and must increase Valspar's market share in that area by selling paint to Lowe's

customers and contractors, promoting Valspar to Lowe's management, identifying and

seizing upon marketing opportunities, and convincing Lowe's associates to sell Valspar

paint (over competing brands) by training them on Valspar's benefits.[12]

---

[11] Weyrens, Vol. 1, 5:14-21; Coffey, 73:12-74:2, 193:10-20 (helped drive sales; had objective to increase brand and market share); Guilfoyle, 282:9-13 (job responsibility to drive sales).

[12] Declaration of Misty Stocks , Ex. 1 (job descriptions); Caris, 60:14-61:11 (showed managers tinting information "[t]o try to help increase our market share in the stores"); Martinez, 125:15-126:8 (puts up displays to increase visibility and market share); Jack

TMs work in the field[13] and are offered a company car.[14]  TMs spend the vast

majority of work time in Lowe's stores and at customer sites.[15]  TMs generally perform

their work alone, independently, and almost always free from supervision.[16]  They only

see their Regional Managers ("RMs") in person a few times per year.[17]

**B.**     **Valspar Communicated Expectations that TMs Drive Sales; But Some Plaintiffs Purport to Have Different Understandings of Job Functions.**

Valspar emphasizes the expectation that TMs drive sales by compensating them

for individual sales results.  TMs participate in an incentive compensation plan

("Valshare") tied to their own sales results.[18]  TMs receive different amounts depending

on their success.[19]  Up to $14,287 or 30.6% of TMs' compensation comes from Valshare,

which is awarded wholly based on sales.[20]  TMs are also eligible for "spiffs" (per-can-

sold compensation) for paint *sold* on designated days.[21]

Valspar also laid out its expectations in corporate documents, but Plaintiffs report

varied understanding of these:

Smith, 106:19-107:3 (is "representative" of Valspar); Guilfoyle, 153:10-154:10 (tried to get contractors' commitment to buy Valspar products); John Smith, 158:1-6 ("the best way to increase your sales was training").
[13] Sladewski, 39:23-42:1 (worked at Lowe's stores; never worked at Valspar office); Basil, 23:15-19 (job requires work in field).  *See also* Fife Dec. ¶8.
[14] Joseph, 81:17-82:1; Maxted, 138:17-23.  *See also* Fife Dec. ¶8.
[15] *See* Fn.13.
[16] Maxted, 81:21-25 (RM "was hands-off.  Like I said, I was self sufficient at that point"); Sladewski, 48:14-49:6, 58:23-59:3 (RM "didn't want to be up in your territory having to take care of situations…he let you run it like it was your own business").  *See also* Fife Dec. ¶8.
[17] Grimes, 103:19-25 (saw RM once a quarter or less); Dinelli, 103:18-20 ("might see [RM] once every two or three months").  *See also* Fife Dec. ¶8.
[18] Hanchey, 194:24-197:7.  *See also* Fife Dec. ¶8.
[19] Nodler, 19:21-20:17 (Valshare "based on the amount of product that was sold through the Lowe's stores in my territory").
[20] Cox, 118:12-119:14; Weyrens, 130:7-10 (Valshare motivates TMs to "grow the campaign and see that it sells"); Fife Dec. Ex. 66 (Weyrens Dec. ¶3).
[21] Cox, 210:23-211:7; O'Reilly, 87:10-88:10.  *See also* Fife Dec. ¶8.

| Document | Contents | Understanding |
|---|---|---|
| **Performance Evaluations**[22] | Generally judges performance on achieving specific sales goals, business development, locating marketing opportunities, training and developing Lowe's associates, and exercising judgment and decision-making. TMs also received trip reports evaluating their success in selling commercial-grade paint to contractors.[23] | Many Plaintiffs admitted their job performance was evaluated under these criteria, and strove to meet them.[24]  Others believed performance was judged on criteria not articulated in evaluations.[25] |
| **Job Descriptions**[26] | Outlines expectations that TMs perform sales and marketing. Job descriptions *do not* contain job duty Plaintiffs claim is primary:  maintaining appearance of Lowe's stores.  Job description says TMs "*Oversee* maintenance of color collateral and merchandising displays."[27] | Many TMs have not seen the job descriptions.[28] |
| **Standards of Conduct**[29] | Outlines expected TM behaviors:  "You are a professional paint representative"; "Working for Valspar is a business that you own"; "Realize that you are not only selling paint, you are selling yourself." | Some Plaintiffs read and understood Standards of Conduct; others aren't sure they have seen them.[30] |

---

[22] Coffey, 161:14-166:20, Ex. 10 (Performance Management Review).  *See also* Fife Dec. ¶8.
[23] Candelaria, 147:8-171:7, Ex. 107 (trip report).  *See also* Fife Dec. ¶8.
[24] Borchin, 144:15-145:17 (re Core Competencies: "I would imagine that these are the things that Valspar feels are the essential areas of our abilities"); Kern, 142:1-14; M. Sullivan, 196:18-197:2.  *See also* Fife Dec. ¶8.
[25] Clark, 127:15-128:6 (didn't understand increasing accounts was a key responsibility); Wenster, 156:13-23 (RM had own checklist of objectives).
[26] Stocks Dec., Ex. 1.
[27] *Id.*
[28] Landry, 124:21-23 (never seen job description); Horace, 15:17-17:15.
[29] Stocks Dec., Ex. 2, 3 (Standards of Conduct).
[30] Daugherty, 84:5-85:3 (received and looked through it); Kern, 123:9-19 ("I'm sure I've seen it before, but it doesn't look immediately familiar.  Slightly familiar").  *See also* Fife Dec. ¶8.

| Document | Contents | Understanding |
|---|---|---|
| **Training Materials**[31] | Valspar provides sales training, including "Selling Skills" and "Commercial Sales Training."[32]  The Commercial Sales Training clearly requires TMs to "ask for commitment" and "make the sale." | Some TMs admit to receiving sales training, others don't.[33] |

## C.   TM Testimony Illustrates Differences.

### 1.   Plaintiffs Differ in Whether They View Their Activities as Sales.

Some Plaintiffs vehemently rejected that they engaged in sales.[34]   Others referred

to themselves as salespeople:

- Guilfoyle doesn't know if he is "one of the most successful salespeople" at Valspar, but "I'm good at it."[35]

- Daugherty considers herself a "sales representative" for Valspar.[36]

- Crandall says that "part of being a Valspar salesperson" is "[y]ou really need to promote your product."[37]

Some Plaintiffs even touted their sales by providing "success stories" on Valspar's

"Business Intelligence" ("BI") system.[38]  Plaintiff Nodler submitted 22 separate success

stories[39], including:

---

[31] Stocks Dec., Ex. 5 (Commercial Sales Training, p. 25).
[32] Zukosky, 122:4-123:8; Palmer, 137:3-13. *See also* Fife Dec. ¶8.
[33] *Id.*; O'Reilly, 202:14-23 (doesn't sales training); Maxted, 213:9-214:8 (as to "Selling Skills": "I recognize it…I've probably seen dozens of these kinds of trainings while I worked at Valspar").  *See also* Fife Dec. ¶8.
[34] Paul Smith, 81:23-82:16 ("I'm not a salesperson"); McKay, 78:11-79:19; Sullivan, 91:9-12, 106:8-107:6, 110:13-111:1.  Although Plaintiffs seemed to be coached at deposition (e.g., they could not "sell" because they are not cashiers and cannot force anyone to buy Valspar paint), other non-Plaintiff TMs testified to a very different view of their role.  *See* Fife Dec. ¶8, Exs. 13, 57 (Cooper, Vaughn depositions).
[35] Guilfoyle, 159:2-10.
[36] Daugherty, 90:16-21.
[37] Crandall, 77:22-78:1.  *See also* Fife Dec. ¶8.

- After making a sale, advised that TMs should "make sure you get *everything done in your power to get the job done*" and "*supervise every single aspect of the transaction, which is exactly what I am doing*."

- Made a sale "due to follow up and very good presentation skills along with my pledge to satisfy his every product need. I think we at least have a *verbal agreement* at this time with an actual order to follow."

- Reports: "[s]ide by side selling with associates."

- Admits, "I need to spend more time in the field calling on customers. It's amazing that if you stop by in person how much more effective our sales calls can be."[40]

At deposition, Nodler changed his story: "It's not my job to sell to the customer," claiming he only affected sales by training Lowe's associates.[41]

At deposition, many Plaintiffs admitted the only reason they claimed they did not "sell" is because they did not ring customers up at cash registers.[42] Others claimed they did not sell because they could not set prices.[43] But some admitted they ***obtained commitments to buy*** paint.[44]

---

[38] Weyrens, Vol. 2, 44:17-45:5. BI also includes vast sales data for TMs to analyze. Coffey, 44:8-45:3 (there were hundreds or thousands of reports to see).
[39] *See* Stocks Dec., Ex. 6.
[40] *Id.* These are just of few of hundreds of sales "success stories" Plaintiffs reported. *Id.*
[41] Nodler, 76:12-77:1.
[42] Martinez, 233:14-21 ("I don't actually sell paint. I could promote the product, educate the customer, and instruct them how to use it, but as far as sales I don't take customers up to the register and physically sell it"). *See also* Fife Dec. ¶8.
[43] Dinelli, 149:16-150:9 ("I did work with some contractors, but I wasn't really selling. I didn't pick price"). *See also* Fife Dec. ¶8.
[44] Guilfoyle, 153:10-154:10 (tried to get commitment to buy); Candelaria, 168:13-26 (asking for commitment is part of closing the sale); Borchin, 173:13-175:3; D. Smith, 128:19-129:2. *Non-Plaintiff* TMs testified their job included selling. Vaughn, 50:23-51:2.

## 2. Plaintiffs Report Differences Regarding Store Appearance Duties.

Some Plaintiffs characterize their core job as maintaining store appearance

(stocking shelves, cleaning displays, placing paint chips , etc.).[45]  Others do not.[46]

| Issue | Differences | | |
|-------|-------------|---|---|
| **Whether TM does housekeeping** | TM convinces Lowe's associates to place paint chips/do housekeeping[47] | vs. | TM does housekeeping for Valspar displays[48] |
| **Time spent filling paint chips[49]** | As little as 15 minutes a day[50] | vs. | Up to five hours[51] (and everything in between)[52] <br><br> This includes multi-tasking; TMs talk to customers while "housekeeping"[53] |

---

[45] TMs admit this activity is akin to filing papers.  *See*, *e.g.*, Pechilis, 153:9-11.

[46] *See*, *e.g.*, Hanchey, 175:2-16 ("Selling is what my manager wants to see").

[47] Pechilis, 23:24-24:3, 151:19-152:4; McLain, 155:21-156:4; Coffey, 32:5-13.

[48] Michael Sullivan, 161:4-161:12.  *See also* Fife Dec. ¶8.

[49] Various factors affect time spent on chips.  Some TMs use creativity to minimize time spent.  "Kevin Pond in Dallas recently took it upon himself, he wanted to shorten the time that he was spending on that part of his job by – so he could have more time for training and selling, and he got the – he got a list of the top 100 chips, and that's all he focuses on, unless if there's another chip out on the rack, then he'll order it and put it in when it comes in.  But for the most part he spends his time doing just the top 100 chips, and he spends – I want to say he said less than a half hour, maybe 15 minutes, managing color collateral now, which gives him more time for training and selling."  Weyrens Vol. 2, 30:19-31:24.

[50] Caris, 151:8-13 (15-20 minutes).

[51] Cox, 192:8-13.

[52] Coggins, 110:19-111:19 (30-120 minutes).

[53] Dinelli, 76:17-77:20 ("would be interrupted the whole time" while filling chips); Pittman, 50:12-51:1.  *See also* Fife Dec. ¶8.

**3.      Plaintiffs Reported Significant Differences in How They Spent Work Time.**

TMs self-reported daily surveys of minutes spent on work categories:  (1)In-store selling; (2)In-store Pro-sales[54] calls; (3)Outside Pro-sales calls; (4)Training; (5)Department analytics; (6)Store appearance; (7)Remerch, resets, or store set.[55] (Valspar contends all categories are sales-related, but refers to 1-3 as "sales" categories because they specifically mention sales.)  Plaintiffs' self-reports of time spent on these tasks vary wildly week-by-week and Plaintiff-by-Plaintiff.

For example, Plaintiff Borchin reported spending as much as 58.7% and as little as 9.4% on "sales" in a given week, and as much as 52.5% and as little as 0% on "store appearance" in a week.  Plaintiff Ochoa reported spending as much as 68.4% and as little as 16.4% on "sales" in a given week, and as much as 44.8% and as little as 0% on "store appearance" in a week.  These charts illustrate week-by-week amount of time these Plaintiffs reported they spent on "sales" versus "store appearance."

---

[54] "Pro" is commercial-grade paint aimed at contractors.  Crossfield, 110:10-20.
[55] Stocks Dec., Ex. 7 (survey data).





Not only did Ochoa generally report far more time on "sales" overall than "store appearance," she also reported significant time on training.[56]  Borchin, on the other hand fluctuated between reporting the majority of his time on "sales" and "store appearance." Other Plaintiffs' data reveals a host of differences.[57]

TMs did not always enter accurate data.  For example, Plaintiff Candelaria admitted his entries were just estimates, and he included time interacting with customers in "reset" and "in-store selling."  Plaintiff McLain falsified data just to get it done:  "until that survey was complete, the PDA wouldn't let you go on to another store."[58]  "If you read them surveys, you'll see that there's some weird stuff in there on mine.…I just hit buttons as fast as I could to get me through the survey."[59]  This contradicts McLain's discovery responses, in which he claimed he tried to be as accurate as possible in surveys.[60]  This means Valspar must test the credibility of all individual surveys, since Plaintiffs' self-reports of time spent on tasks can impact individual exemption analysis.

---

[56] *Id.*.
[57] *Id.*; *see also* Fife Dec. ¶8.
[58] McLain, 149:17-150:1.
[59] McLain, 150:7-150:14.   This violates company policy against falsifying records. Stocks Dec., Exs. 2, 3 (Standards of Conduct).
[60] Fife Dec., Ex. 71 (McLain RFA Response No. 1).

### 4. Plaintiffs Admit to Significant Differences in Other Duties.

| Duties | Differences | | |
|---|---|---|---|
| **Time spent on sales** | Up to 100%[61] | vs. | None[62] |
| **Analyzing sales data** | TMs performed heavy analysis of BI to determine sales trends and made significant decisions, such as focusing marketing and training efforts[63] | vs. | TMs logged onto BI only because Valspar required it[64]<br><br>-or-<br><br>TMs printed out reports for Lowe's management without conducting analysis[65] |
| **Developing and implementing strategic marketing plans ("SMPs")** | TMs use significant planning, strategic thinking, and analysis of trends to determine a plan to market/sell Valspar products[66] | vs. | TMs never put together SMP[67]; it was not required until 2010[68]<br><br>-or-<br><br>TMs exercised little autonomy putting together SMP; supervisor dictated contents[69] |

---

[61] Stocks Dec., Ex. 7 (survey data).

[62] *Id.*

[63] Starr, 72:12-73:4 (BI "was very monstrous to go through, very time consuming" and required "a lot of time going through the numbers and a lot of drilling down and different sheets…"); Crandall, 91:17-92:4; Zukosky, 80:1-14.

[64] McLain, 54:11-23 (could "click and go through the motions to make them think that you was [sic] hitting it").

[65] Clark, 99:11-16; O'Reilly, 41:1-6.

[66] Paul Smith, 232:23-234:13 ("I look at my numbers on BI.  I try to do the best I can making a judgment call based on that to increase my sales in whatever store it may be, with that strategic marketing plan, goals and objectives I would like to meet at the end of the quarter"). *See also* Fn.70; Fife Dec. ¶8.

[67] Simmons, 247:5-8; David Smith, 113:17-22; Kloetzer, 113:4-9.

[68] Stocks Dec., ¶10.

[69] J. Sullivan, 102:5-103:6; Joseph, 194:23-197:5.

| Duties | Differences | | |
|---|---|---|---|
| **Time spent on SMP** | An entire day[70] | vs. | None[71] -or- Less than one hour[72] |
| **Identifying marketing opportunities and convincing Lowe's to capitalize on them** | TMs seek out more space for Valspar products, and obtained end caps, stack outs, and cross-merchandising displays[73] -and- TMs convinced Lowe's management to allow more space for Valspar products by showing them sales trends and positive impact of additional space[74] -and- TMs fostered good relationships with Lowe's management to gain more marketing opportunities[75] | vs. | TMs did not make much efforts because Lowe's management sometimes said no[76] -or- TMs only got end cap as a result of national plan[77] -or- TMs did not bother with stack-outs because Lowe's associates might clear it[78] |

---

[70] Candelaria spends up to a full day writing SMP that explains "how we are going to push our business." Candelaria, 177:13-191:16. He uses BI to determine sales numbers for different products, then analyzes and strategizes for "bring[ing] up" the numbers. *Id.* Candelaria uses SMPs to "analyze [his] business," determine what training to conduct, set goals and deadlines for his sales growth, and identify opportunities to get commercial contractors to "buy more" Valspar paint. *Id. See also* Landry, 188:22-192:10 (took 8 hours to accumulate data, analyze it, and complete SMP).

[71] David Smith, 113:17-114:5 (SMP is "something that I never done").

[72] J. Sullivan, 349:6-350:5.

[73] Clark, 118:25-120:9 (always tries to ask for end caps because it improves sales); McLain, 91:21-92:19 ("generally they were real receptive when I'd ask [for] an end cap, I'd get one about every time"); Crandall; 76:24-78:5 (exerted influence to try and get side-stacks because "that's part of being a Valspar salesperson"). *See also* Fife Dec. ¶8.

[74] Crandall, 117:13-118:12 (analyzed BI and presented numbers to store manager); Palmer 58:16-60:13 (met with store managers to discuss sales numbers and create game plan).

[75] Sladewski, 62:2-21 ("how many endcaps you would receive is a direct correlation of how hard you worked in their store and if you had a good relationship with all your store managers").

[76] Hanchey, 83:24-84:11.

| Duties | Differences | | |
|---|---|---|---|
| **Efforts to increase inventory** | TMs order inventory[79]<br><br>-and-<br><br>TMs tell Lowe's management to change inventory levels based on sales trends[80] | vs. | TMs make no effort to increase/order inventory[81] |
| **Designing displays** | TMs use initiative and market knowledge to creatively promote and advertise Valspar products[82] | vs. | TMs never created displays[83] |
| **Cold-calling contractors to drum up business** | TMs identified contractors to target in various ways[84]:<br><br>- combing phone book<br><br>- placing fishbowl for business cards at Lowe's commercial sales desk<br><br>- internet searches<br><br>- on the lookout when driving about town[85] | vs. | TMs make no efforts to identify contractors[86]<br><br>-or-<br><br>TMs just wait for leads from the Lowe's commercial sales desk[87]<br><br>-or-<br><br>TMs were employed before the contractor program began in 2009[88] |

---

[77] Marrone, 87:4-13.  *See also* Fife Dec. ¶8.
[78] Kloetzer, 53:25-60:18.
[79] Crandall, 147:8-148:7; Candelaria, 31:25-32:6.
[80] Steele, 103:12-105:12; McLain, 128:2-17.
[81] Nodler, 147:1-11; Paul Smith, 95:22-96:8.
[82] Clark's supervisor "encourages ideas and creating things to help drive Valspar inside Lowe's."  Clark, 171:23-172:1.  Clark has a graphic design background and used an entire day the week before his deposition to create a sign to be used region-wide.  Clark 171:23-173:18.  Paul Smith "went above and beyond and created a display…a very large paint can that says 'Valspar'" and placed it at Lowe's commercial sales desk.  This was his own idea.  Paul Smith 68:11-22.
[83] Coggins, 261:8-10; Pittman, 93:17-20.
[84] Weyrens, Vol. 1, Ex. 29.
[85] Crandall, 52:1-17; Coffey, 180:12-21; Zukosky, 46:17-47:10; Paul Smith; 217:8-24; David Smith, 97:1-15.
[86] Pittman, 35:7-13, 35:23-36:15, Jack Smith, 224:1-12.
[87] John Smith, 151:5-13; Nodler, 31:24-32:1; Hanchey, 172:19-173:4; Maxted, 98:18-24.
[88] Kloetzer, 29:11-30:23.

| Duties | Differences | | |
|---|---|---|---|
| **Closing deals with contractors** | TMs seek contractors' commitment to buy Valspar paint[89]<br><br>-and-<br><br>TMs clinch the deal by, giving free paint, giving free hats/merchandise, handing out coupons to lower the price of paint, and working with Lowe's to get contractors discount[90]<br><br>-and-<br><br>TMs' sales skills affected how successful they were at making sales to contractors[91] | vs. | TMs claim they just tell contractors about Valspar and its benefits, but do not actually "sell"[92]<br><br>(But TMs admit they do this so the contractor will purchase Valspar paint[93]) |
| **Amount of time spent on commercial sales program** | Survey data shows 70% in one day.[94] | vs. | Survey data shows 0% in one day.[95] |

---

[89] Coffey, 204:18-205:23 (does good job closing and getting commitment); Guilfoyle, 153:10-154:10.

[90] Palmer, 135:22-136:21 (gave away samples "weekly"); Candelaria, 157:2-159:18, 159:19-163:19, 163:20-164:9; Crandall, 57:12-18; Basil, 30:14-31:10.  *See also* Fife Dec. ¶8.

[91] Zukosky, 81:22-82:5 (considered himself to have good contractor sales skills); Wenster, 32:1-32:17 (sales skills "important" to commercial sales).  *See also* Fife Dec. ¶8.

[92] McKay, 78:11-79:19 ("I'm not there to make a sale, I'm there as an information source").  *See also* Fife Dec. ¶8.

[93] J. Sullivan, 70:22-74:22.

[94] Stocks Dec., Ex. 7 (survey data).

[95] *Id.*

| Duties | Differences | | |
|---|---|---|---|
| **Approaching customers in Lowe's and selling Valspar products** | TMs routinely approached customers, identified their needs, and matched them with Valspar products so the customer would purchase[96] | vs. | TMs don't approach customers[97]<br><br>-or-<br><br>TMs did not try to convince customers to purchase Valspar paint[98] |
| **Driving sales by training Lowe's associates** | TMs increased sales by training Lowe's associates[99]<br><br>-and-<br><br>TMs tailored training to convince Lowe's associates of the superiority of Valspar paint[100]<br><br>-and-<br><br>TMs understood purpose of training is persuading Lowe's associates to sell Valspar [101] | vs. | TMs believed training did not affect sales much[102]<br><br>-or-<br><br>TMs only trained Lowe's associates by reading from the back of the paint can, or using pre-prepared materials[103]<br><br>-or-<br><br>TMs believe they cannot persuade Lowe's associates to sell Valspar[104] |

---

[96] Coffey, 63:19-65:2 (approaches customers, asks questions, guides them towards Valspar products); Dinelli, 77:21-79:4.  *See also* Fife Dec. ¶8.

[97] Jack Smith, 259:22-260:4.

[98] Kloetzer, 123:13-124:7; Ochoa, 155:6-19.

[99] John Smith, 158:1-6 ("best way to increase your sales was training"); Dinelli, 105:25-106:5 (sales increased because "I'm good at training").

[100] Maroun, 74:14-24 (created specific training modules); Murrian, 60:20-61:20 (did "targeted" training); Clark, 255:21-256:4 (was "creative" in training).  *See also* Fife Dec. ¶8.

[101] Barrett, 166:21-167:9 ("training usually equals sales" because associate knows what product to recommend); Basil, 245:1-4.  *See also* Fife Dec. ¶8.

[102] Grimes, 214:3-5.

[103] Grimes, 149:4-15.

[104] Kern, 74:8-11; Rogenski, 125:9-19.

| Duties | Differences | | |
|---|---|---|---|
| **Resolving customer complaints using business judgment**[105] | TMs could replace as much paint as needed without supervisor approval[106]<br><br>-and-<br><br>TMs gave supervisors recommendations when, in their discretion, the nature of the complaint merited a higher amount of paint refunded, or a cash refund, or payment of labor costs[107] | vs. | TMs could only replace as little as 5 gallons of paint without supervisor approval[108] |
| **Determining when to deviate from "planogram" (maps of where things go)**[109] | TMs have autonomy to adjust the layout of Valspar paint within allotted space, and must understand sales trends to do this[110] | vs. | Some TMs believe they cannot change layout of Valspar paint[111] |

In sum, Plaintiffs, who were largely left to their own devices to determine how to

structure their workday and carry out their job duties, had very different understandings

---

[105] TMs are expected to use judgment and discretion to handle and resolve customer complaints in a way that maintains good customer relations.  Stocks Dec., Ex. 2 (job descriptions); Sladewski, 110:15-20 ("do whatever it took to make the customer happy").  *See also* Fife Dec. ¶8.

[106] Joseph, 36:9-37:9 (allowed to give as much free paint as he wanted without checking with supervisor).

[107] Pechilis, 92:4-22 (recommended that Valspar pay labor costs; supervisor agreed); Jack Smith, 130:18-136:18 (recommended $3500 refund; supervisor accepted).  *See also* Fife Dec. ¶8.

[108] Grimes, 99:2-6; Coggins, 63:14-22 (15 gallons).

[109] TMs can convince Lowe's to give them more space than allowed by the planogram.  Fields, 56:8-10; Landry, 129:22-130:22.

[110] Starr, 73:23-74:11 (if "you sold a lot of one product you could take [*sic*] discretion if you had backing from your sales numbers to increase maybe a facing of that product"); Crossfield, 219:7-12 (adjusted planogram to meet sales volume); John Smith, 168:10-169:22 (adjusted based on rate of sale).  *See also* Fife Dec. ¶8.

[111] Daugherty, 37:15-20 (couldn't change planogram); Nodler, 153:6-154:13 (didn't adjust because "planograms were pretty good").

of what their job entailed.  The performance of their job duties and work experiences vary wildly.

### D.    Determining Amount of Work Time

There are likely many weeks where Plaintiffs worked 40 hours or fewer.[112]  Many Plaintiffs admit they cannot say how much time they spent working on any given week.[113]  Plaintiffs have no reliable records of their time worked and Valspar did not maintain generally time records because it considered TMs exempt.[114]

Lowe's requires Valspar TMs to log in and out of the stores using the "LSM" system.[115]  These records might not accurately represent the amount of time TMs spend working in stores.  TMs admit they routinely forgot to log in and out of LSM.[116]  TMs often did not log out for lunch breaks and time spent doing personal tasks, such as telephone calls or medical appointments.[117]  TMs can also manipulate LSM data by intentionally not logging out (creating a "forced log out," resulting in the appearance of more time spent in-store than reality) or by having others log them in.[118]  Some TMs remained logged in to the LSM system when they left the stores to meet customers;

---

[112] *See, e.g.*, Candelaria, 96:6-9; Zukosky, 100:23-101:22.

[113] Crandall, 158:23-159:6 ("truthfully, I couldn't tell you a week that I would know for sure how many [hours] I worked…").  *See also* Fife Dec. ¶8.

[114] Marrone, 178:5-179:9; Guilfoyle, 9:5-11; Stocks Dec. ¶2.

[115] Martinez, 89:15-22; Paul Smith, 121:10-122:9; Crossfield, 132:11-17.

[116] Candelaria, 63:4-25 ("always forget to punch in"); McLain, 117:6-12.

[117] McLain, 120:18-22; Paul Smith, 240:4-12; Clark, 164:20-166:5 (chatted re fantasy baseball league).

[118] Paul Smith, 124:13-127:1; Joseph, 131:4-135:3; Stocks Dec., Ex. 8 (TM letter accusing one TM logging another in).

others did not.[119]  Some TMs changed their practices over time or based on whether the

meeting fell in the middle of the workday, as opposed to before or after the store visit.[120]

These inaccuracies shows LSM *over-reports* working time.  Yet many Plaintiffs'

LSM data shows they often worked in stores fewer than 40 hours per week.[121]  In any

event, each Plaintiff will need to testify about their unique circumstances relating to time

worked for the Court to determine what, if any, overtime might be owed if liability is

established.

## V.  ARGUMENT

**A.  <u>Plaintiffs Bear the Burden of Proving They are Similarly Situated Under the Strict Second-Stage Standard.</u>**

To proceed with this action collectively, Plaintiffs bear the burden of establishing

they are similarly situated.  *Smith*, 404 F. Supp. 2d at 1149.  This case is at the "second

stage," where the Court applies a stricter "similarly situated" standard based on a factual

determination and the record developed through discovery.  *Id.*  The Court "reviews

several factors, including (1) *disparate factual and employment settings of the*

*individual plaintiffs*; (2) the *various defenses* available to defendant which appear to be

*individual to each plaintiff*; [and] (3) fairness and procedural considerations."  *Id.* at

1150 (emphasis added).  Ultimately, "where individualized determinations are required,

certification of a FLSA collective action is inappropriate."  *Keef v. M.A. Mortenson*, 07-

CV-3915(JMR/FLN), 2009 WL 465030, *3 (D. Minn. Feb. 24, 2009).

---

[119] Bond, 96:7-17; Palmer, 141:21-142:22; Mitchell, 122:18-22.
[120] Pechilis, 67:19-68:3; Mitchell, 97:23-98:9.
[121] *See e.g.,* Fife Dec., Ex. 75 (LSM data).

**B.**     **Plaintiffs Cannot Meet Their Burden of Demonstrating They are Similarly Situated in Light of Disparate Factual Employment Settings.**

If the case proceeds to collective trial, the fact-finder will need to consider whether each Plaintiff was properly classified as exempt and how many hours they worked each week.  Valspar likely will assert three separate exemptions:  outside sales, administrative, and combination.  Each requires a case-by-case analysis for each Plaintiff.

Courts recognize that "to determine which employees are entitled to overtime compensation under the FLSA depends on an individual, fact-specific analysis of each employee's job responsibilities under the relevant statutory exemption criteria."  *Smith*, 404 F. Supp. 2d at 1150.  *See also Keef*, 2009 WL 465030, *2 ("The regulations clearly contemplate an individualized inquiry into each plaintiff's job responsibilities").  The Court must consider *each Plaintiff's* actual, day-to-day activities.  *Cruz*, 764 F. Supp. 2d at 1062.

The exemptions look to the "primary duty" of each Plaintiff "based on all the facts in a particular case" (29 C.F.R. §541.700(a)) and requires several steps.  The fact-finder must determine whether each duty is exempt in light of the way the TM performs that work.  Then, the Court must make a quantitative determination of whether the TM performed at least 50% exempt work on a week-by-week basis.  *See Smith*, 404 F. Supp. at 1148.  If the TM spends more than half her time on exempt duties, she is exempt.  *See* 29 C.F.R. §541.700(b).

But if a TM spends less than half her time on exempt duties, that does not automatically render her non-exempt.  *See Carlson v. C.H. Robinson Worldwide*, 02-

3780(JNE/JJG)/02-4261(JNE/JJG), 2006 WL 2830015, *4 (D. Minn. Sept. 26, 2006).

The fact-finder must still determine whether the exempt tasks nevertheless predominate

or define the job.  *Id.*; 29 C.F.R. §541.700(a)(looking to the "relative importance of the

exempt duties").  Because Plaintiffs perform different exempt job duties, place relatively

different levels on importance on them, and spend different amounts of time on them,

Plaintiffs fail to meet their burden of showing they are similarly situated.

>    **1.     A Fact-Finder Must Consider Individual Plaintiffs' Outside Sales
>            Duties.**

In applying the outside sales exemption, the fact-finder will need to consider, *inter

alia*, whether a particular Plaintiff:

- Obtained a non-binding commitment to buy.

- Had sales experience.

- Was trained to close sales calls by obtaining the maximum commitment
  possible.

- Worked away from the office with minimal supervision.

- Was rewarded for efforts with incentive compensation.  *Christopher*, 132 S.Ct.
  at 2172-73.

Different Plaintiffs admit some, all, or none of these points.

For Plaintiffs who insist they did not impact sales, Valspar must "present[]

[individual] unsatisfactory performance reviews…to demonstrate that those Plaintiffs had

exempt duties but either failed or refused to exercise those duties, thereby convert[ing] an

exempt job into a non-exempt one."  *Reyes, L.P.*, 2007 WL 101808, *5 (internal

quotations omitted).

Merchandising/store appearance work can be relevant and counts as exempt work if the TM directed efforts at consummating sales at the stores. *Ackerman v. Coca-Cola*, 179 F.3d 1260, 1265 (10th Cir. 1999) (citing 29 C.F.R. §541.504(c)(4)). Whether merchandising work counts as a sales-related duty could vary by Plaintiff because it depends on whether a fact-finder determines that the TM made sales efforts or not.

### 2. A Fact-Finder Must Consider Individual Plaintiffs' Administrative Duties.

A fact-finder must consider whether individual Plaintiffs did these administratively exempt duties:

- Formed a strategic plan designed to maximize sales in territory. *Smith v. Johnson and Johnson*, 593 F.3d 280, 285 (3d Cir. 2010).

- Met with Lowe's management, contractors, and customers to increase their preference for Valspar products and, hopefully, increase the market share. *Schaefer-LaRose*, 679 F.3d at 563-64, 577.

- Engaged target (i.e., Lowe's management, contractors, and customers) in conversation whenever possible. *Id.* at 581.

- Delivered Valspar's message with precision, including tailoring it to the target's needs. *Id*.

- Prepared for meetings by analyzing business data. *Id.* at 569-70.

- Gave out free product samples. *Id.* at 563.

- Represented Valspar and served as the primary point of contact for Lowe's management and customers. *Id.* at 566, n.12, 582.

- Asked for a commitment to buy. OR, if they did not explicitly ask for a commitment (or prefer use a softer touch), whether Valspar trained them to ask for a commitment on sales calls. *Id.* at 565, 568-69, 579.

- Attempted to develop continuing relationships with Lowe's management and contractors to create an ongoing, positive impression of themselves as well as Valspar and its products. *Id.* at 565.

- Structured their day independently and worked alone. *Id.* at 566.

- Exercised discretion resolving customer complaints and maintaining customer relations by refunding products/recommending refunds. Although Plaintiffs claim they don't always have final authority, this is not required for exemption. *Cruz*, 764 F. Supp. 2d at 1067; 29 C.F.R. §541.202(c).

Each factor is relevant and must be evaluated for each Plaintiff. Because of Plaintiffs' varying testimony regarding which and how many of these duties they performed, they cannot meet their burden of showing they are similarly situated.[122]

## C.    **Various Defenses are Individual to Each Plaintiff.**

### 1.    **Valspar Will Assert Individualized Exemption.**

Exemption is an affirmative defense, and Valspar intends to exercise its due process right to assert the defenses against each individual Plaintiff. *See Aquilino v. Home Depot*, 04-04100(PGS), 2011 WL 564039, *9 (D.N.J. Feb. 15, 2011)(defendant is entitled to question each opt-in about responsibilities to illustrate they are exempt); *Mendoza v. Home Depot*, CV09-058343-SJO(JCx), 2010 WL 424679, *13 (C.D. Cal. Jan. 21, 2010)(employer has "fundamental due process right" to raise individual affirmative defenses); *Johnson v. Big Lots Stores*, 561 F. Supp. 2d 567, 586 (E.D. La. June 20, 2008)(decertifying collective action after collective trial; "defendant's inability to cross-examine the vast majority of the opt-in plaintiffs was prejudicial"); *Wal-Mart*

---

[122] Geographical differences impacted sales, workload, and importance of job duties. Weyrens, Vol. 1, 6:13-24; M. Sullivan, 43:4-12. *See also* Fife Dec. ¶8. These differences render collective treatment inappropriate. *See Reyes v. Texas Ezpawn*, V-03-128, 2007 WL 101808, *4 (S.D. Tex. Jan. 8, 2007).

*Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2545 (2011)(commonality of a class action requires that plaintiffs "depend upon a common contention" and that "the determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke").

Plaintiffs' own descriptions of their jobs are strikingly different, requiring individual testimony to determine exempt status. For example, the following three Plaintiffs all admitted to performing a mix of outside sales and administrative duties, but testified that they differed in what particular exempt duties they performed, the way in which they performed those duties, and the relative weight that they put on each duty.

Opt-in Plaintiff Wenster came to Valspar with outside sales experience[123] and admitted that she spent at least *50% of her time* per week on sales activities (10% on the commercial contractor program, 10% analyzing sales numbers, and 30% on in-store marketing directly to customers).[124] She was not very successful in selling to commercial contractors, but was far more successful selling to in-store customers.[125] Wenster admitted, "*My presence in stores*, me being present there, *increases sales*."[126] Since Wenster spent so much time on sales and sales-related activities, she clearly met the outside sales exemption.

Named Plaintiff Candelaria came to Valspar after working as a Lowe's paint associate – where he did job duties that Plaintiffs now claim Valspar TMs perform (i.e.,

---

[123] Wenster, 25:10-25.
[124] Wenster, 63:1-13, 65:7-66:3.
[125] Wenster, 148:24-151:16, 109:20-113:15.
[126] Wenster, 108:3-5.

maintaining store appearance and downstocking paint).[127]  Candelaria spends more time on the commercial sales program than he used to because he is in restricted duties due to a work injury.[128]  He targets contractors for sales of Valspar's commercial-grade paint[129] and makes "sales calls" to commercial businesses to "talk to the customer," "[t]alk about our products," "[t]each them about what our products do," "find out what [paint] they're using," and "look[] for opportunities to have [the customer] purchase Valspar paint lines that are equivalent to what they're currently using."[130]  Candelaria then gives contractors shirts, hats, bandanas, fan decks, and color-matched paint samples "in order to induce them to buy Valspar paint."[131]

Candelaria also admitted to performing some administratively exempt duties in addition to sales-related activities.  He recently spent at least six hours analyzing BI data and creating an SMP to strategize regarding how to "bring up" sales numbers.[132]  He also makes suggestions to Lowe's associates and managers to effectuate increases in Valspar orders.[133]  Since Plaintiff Candelaria emphasized the importance of sales *and* administrative duties, he likely meets the combination exemption.

Opt-in Plaintiff Zukosky has a bachelor's degree in economics, and admitted performing his duties in an administratively exempt manner.  Zukosky describes himself

---

[127] Candelaria, 31:12-32:12, 111:20-114:16.
[128] Candelaria, 264:24-265:24.
[129] Candelaria, 271:20-275:20, 152:25-154:10, 147:8-151:12, Ex. 107.
[130] Candelaria, 143:10-146:8.
[131] Candelaria, 157:2-159:18, 159:19-163:19, 163:20-164:9.
[132] Candelaria, 177:13-188:13 (uses SMPs to "analyze [his] business" and get commercial contractors to "buy more").
[133] Candelaria, 255:7-259:17.

as someone with both good analytical skills and sales skills, and used those skills to "move the needle" (i.e., increase sales).[134]

Zukosky testified he was the primary Valspar contact for Lowe's management, he exercised discretion in determining his start times and stores to visit each day, and he determined how to best deliver Valspar's message to its target audience with precision.[135] He "moved the needle" by influencing Lowe's associates, building relationships, and convincing them that Valspar's product is superior – so that he could spend more time on selling to customers.[136] Zukosky also drove sales by training Lowe's associates and selling by example.[137]

Zukosky used his economics expertise to "see what was going on numerically in [his] business" and "see the effects of [his] training or things that [he was] trying to do to drive the business in [his] market."[138] He found BI was "definitely helpful" as a "barometer to gauge" whether his efforts to increase market share were successful.[139] This took a lot of work, though, because there was "too much data" in BI and he really had to "dig" into it to get meaningful information.[140] Zukosky's testimony closely tracks the administratively exempt duties in *Schaefer-LaRose*.

---

[134] Zukosky, 80:1-82:5.
[135] Zukosky, 79:8-21, 84:11-14, 93:8-10.
[136] Zukosky, 80:21-81:21.
[137] Zukosky, 78:6-24.
[138] Zukosky, 80:1-80:14.
[139] Zukosky, 80:8-14.
[140] Zukosky, 79:22-25.

Each of these Plaintiffs might fit an exemption for different reasons, and the fact-finder would ultimately need to determine the exempt status based on their individualized facts.  The same is true for the remaining 65 Plaintiffs.[141]

## 2. Valspar Will Assert Individual Defenses Whether Plaintiffs Worked Overtime.

To recover overtime, Plaintiffs must establish they actually worked over 40 hours per week.  Valspar intends to assert individualized defenses, including Plaintiff's individual admissions regarding weeks where they did not work overtime, LSM data showing week-by-week evidence of less than 40 hours spent in stores, and surveys reflecting minutes reported per week on work.  Because of the differences between Plaintiffs, they cannot establish they are similarly situated and decertification is appropriate.  *See Douglas*, 2012 WL 3765029, *6.

## 3. There Are Significant Individualized Defenses Regarding Each Plaintiffs' Credibility.

This collective action should be decertified because of substantial evidence calling the credibility of Plaintiffs' claims into question.  *See, e.g.*, *Smith*, 404 F. Supp. 2d at 1154 (decertifying action; defendant intended to attack credibility of plaintiffs' claims with other's testimony, the employer's policies/practices, and other data); *Aquilino,* 2011 WL 564039, *9 (decertifying action; "[d]efendant intend[ed] to bring to light contradictions between individual Plaintiffs' resumé statements, declarations or interrogatory answers, and deposition testimony").

---

[141] Plaintiff Starr (and perhaps others) executed an agreement releasing Valspar from liability for wage and hour violations. Starr, 94:18-97:8, Ex. 9.  Individual release defenses and the accompanying issues of contract interpretation/validity required Plaintiff-specific determinations.

Many Plaintiffs' deposition testimony flatly contradicts other documents they created memorializing their job duties, such as time-study surveys, success stories, and resumés – as well as contradicting cookie-cutter declarations and written discovery responses. One Plaintiff disavowed ever seeing or signing his sworn declaration, until his counsel redirected him at the end of the deposition.[142]  He, like many others, did not understand and could not explain the meaning of terms that were used in his declaration.[143]  Valspar is entitled to impeach the credibility of individual Plaintiffs based on these contradictions. *Id.*

Plaintiffs' deposition testimony also contradicts their responses to requests for admissions. For example, Mark Allegrini, a former TM, is deceased.[144]  His executrix opted in. She admitted she did not have the information to answer requests for admission[145], but Plaintiffs' counsel submitted the same exact answers as the other Plaintiffs.[146]

Additionally, every Plaintiff denied in their responses to requests for admissions that LSM data is inaccurate.[147]  Yet nearly every Plaintiff who was asked at deposition about LSM data admitted it is inaccurate.[148]

Individual Plaintiffs also contradicted their unique and varied deposition testimony with the cookie-cutter responses to requests for admissions. Plaintiff Hanchey denied in

---

[142] Paul Smith, 196:2-197:7
[143] Paul Smith, 268:15-269:3 (doesn't understand term "event and brand marketing" used in declaration); Martinez, 146:7-147:19; Coggins, 235:22-238:13.
[144] Allegrini, Ex. 1.
[145] Allegrini, 9:17-19; 10:17-12:6; 14:21-15:16, 18:6-20.
[146] Fife Dec., Ex. 66.
[147] Fife Dec. ¶8.
[148] J. Sullivan, 255:5-8, Marrone, 115:16-116:10, Crandall, 157:7-11, Steele, 67:2-8.

admissions that he directed his efforts toward consummation of a sale.[149]  But in

deposition, he stated: "We are in [Lowe's stores] to sell paint.  I'm not going to lie to

you. We are in there to sell paint…. I was in there to increase sales which hopefully I

did."[150]  These contradictions between sworn declarations and discovery responses raise

individualized questions of which medium is more truthful, and how much weight the

fact-finder can give each Plaintiff's testimony.

Putting aside issues of basic honesty, the fact-finder will have to sort out the

tendencies of witnesses to describe tasks differently (i.e., characterizing as exempt or

non-exempt based on point-of-view).  *Aquilino*, 2011 WL 564039, *10.  For example, a

manager stocking shelves with supervisees could be described by a plaintiff supervision

(a managerial task), or by another as simply stocking (an arguably non-exempt task).  *Id.*

The same applies here:  a TM placing color chips while persuading customers to purchase

Valspar products can be described as performing a sales activity.  There is an additional

layer in determining whether filling paint chips is an administrative duty (filing) or

manual labor.  Because each Plaintiff's characterization of several different job duties

varies, "[a]t some point, a trier of fact will have [to] make individual decisions on these

characterizations and credibility."  *Id.* at *10.

Finally, Valspar is entitled to (and will) introduce contradictory evidence from

supervisors and others who have knowledge of individual Plaintiffs' job duties, discretion

exercised, and skill set – so that the fact-finder may determine who is more credible.

---

[149] Fife Dec., Ex. 70 (Hanchey RFA Response No. 62).
[150] Hanchey, 175:2-16.

Because these credibility issues are fact-intensive and Plaintiff-specific, Plaintiffs are not similarly situated and the action should be decertified.

**D.**     **Fairness and Procedural Considerations Mandate Decertification, Since Collective Litigation Would Involve Over 60 Mini-Trials.**

In analyzing fairness and procedural considerations, the Court looks to the purposes of FLSA collective actions, including "*efficiently* resolving common issues of law and fact that arise from the same illegal conduct."  *Cruz*, 764 F. Supp. 2d at 1063.

**1.**     **It is Grossly Inefficient to Determine the Fact-Specific Exemption Issues for Each of the 68 Plaintiffs in a Collective Action.**

Due to myriad individualized factual issues identified in determining the exempt status of each Plaintiff, efficiency considerations require decertification.  "[W]here Plaintiffs' duties and work performed vary significantly, the FLSA exemptions cannot be efficiently adjudicated en masse because the exemption analysis is fact-driven and Plaintiff-specific."  *Id.  See also Keef*, 2009 WL 465030, *3 ("the potential benefit from trying these cases as a collective action is not at all clear"; "trying ten cases simultaneously would complicate any nuanced inquiry"); *Douglas*, 2012 WL 3765029, *6 ("Failing to decertify the conditionally-certified class will unfairly and prejudicially require [the employer-defendant] to prepare for present hundreds of different trials simultaneously").

**2.**     **Determining Each Plaintiff's Overtime is Unmanageable on a Collective Basis.**

As discussed above, there are significant individualized inquiries necessary to determine whether each Plaintiff worked more than 40 hours week-by-week.  There is

further risk in determining any overtime worked because:

- Some TMs manipulated LSM records;

- Many TMs didn't work the entire time logged into LSM;

- There are no records of time TMs allegedly spent working from home.[151]

Determining overtime damages will devolve into unmanageable mini-trials, so the case should be decertified. *Cruz*, 764 F. Supp. 2d at 1063 (decertifying action where "[i]ndividualized damages issues will also make class management complicated"; *Burch v. Qwest Communications*, 677 F. Supp. 2d 1101, 1122 (D. Minn. 2009); *Douglas*, 2012 WL 3765029, *4.

### 3.   Relatively Low Interest in the Suit Suggests that Decertification is Appropriate.

Potential class members' interest in he action is also relevant to decertification. *Keef*, 2009 WL 465030, *3.  Here, only 13.9% of eligible TMs are participating, and several opt-ins dropped out.  This lack of enthusiasm suggests TMs are uninterested in pursuing these claims, militating decertification.

## VI.  CONCLUSION

Plaintiffs cannot meet their burden of showing they are similarly situated. Accordingly, this action should be decertified.

---

[151] J. Sullivan, 38:24-39:5.  *See also* Fife Dec. ¶8.

Date:  November 30, 2012                    WINSTON & STRAWN LLP

                                           By:    /s/  Joan B. Tucker Fife
                                           Joan B. Tucker Fife
                                           101 California Street,
                                           San Francisco, CA 94111-5802
                                           Emilie C. Woodhead
                                           333 S. Grand Ave.
                                           Los Angeles, CA 90071

                                           DORSEY & WHITNEY LLP
                                           Ryan Mick
                                           50 South Sixth Street, Suite 1500
                                           Minneapolis, MN 55402-1498

                                           Attorneys for Defendant
                                           Valspar Corporation